A92A1354, A92A2088. DORSEY v. THE STATE (two cases).

(426 SE2d 224)

COOPER, Judge.

In separate trials, appellant Marilyn Dorsey ("Mrs. Dorsey") was convicted on six counts of rape, aggravated sodomy, aggravated sexual battery and simple battery and appellant James Dorsey ("Mr. Dorsey") was convicted on four counts of rape, aggravated sodomy and sexual battery. These convictions arose out of appellants' relationship with a young woman suffering from a mental disease. In Case Nos. A92A2088 and A92A1354, Mr. and Mrs. Dorsey respectively appeal from their convictions and sentences on numerous grounds.

At Mrs. Dorsey's trial, the evidence revealed that, as the result of childhood sexual abuse by her grandfather ("Pawpaw"), the victim developed a dissociative disorder in which she has at least two distinct personalities — "Big Wendy" and "Little Wendy." When subjected to upsetting situations or memories, the victim's primary or host personality, Big Wendy, retreats and Little Wendy takes over. Such an occurrence is called by the experts a "dissociative state." When the victim goes into a dissociative state, she takes on the voice and personality of a five- to nine-year-old child. There was expert testimony that in this condition the victim can easily be taken advantage of by adults and would be "extremely vulnerable to any manipulation, especially sexual." Little Wendy is aware of most of Big Wendy's activities, but Big Wendy has no personal knowledge of what happens to Little Wendy; for Big Wendy, the time spent in a dissociative state as Little Wendy is a blackout or "lost time." Although the experts said the victim's dissociation is easily triggered, they also testified that an individual with dissociative disorder can appear normal to others as long as circumstances triggering the dissociation are avoided.

During the victim's junior year of high school, she realized she was having problems and sought help from a school counselor. Concerned about the seriousness of the victim's problems, that counselor consulted Mrs. Dorsey, the lead school counselor. For a short time the victim was seeing Mrs. Dorsey and two other counselors on a regular basis, as well as attending classes. Eventually, however, Mrs. Dorsey convinced the victim and her mother that she alone could best help the victim. Consequently, the victim stopped seeing the other counselors and started spending more time with Mrs. Dorsey, often missing classes. The victim and Mrs. Dorsey spent long periods of time in Mrs. Dorsey's office with the door closed and the windows covered. The victim would also often drive home with Mrs. Dorsey, to babysit for the Dorseys' children and then spend the night at their house. The overnight visits became increasingly frequent over the victim's last two years of high school, and after graduation the victim moved

in with the Dorseys. When appellants moved to a new town, the victim moved with them. During the period of approximately five years that the victim lived with the Dorseys, she worked, dated and had many aspects of an apparently normal life.

In the fall of 1990, the victim was beginning to doubt whether living with the Dorseys was helping her. She went into a dissociative state while with a family friend and revealed that she was having sexual relations with the Dorseys. With that friend's encouragement, the victim moved out and sought professional help. In her sessions with psychologists and psychiatrists, the victim as Little Wendy described how Mrs. Dorsey (whom Little Wendy called "Mommy") would talk about Pawpaw and tell her that Pawpaw was coming to get her but that he would stay away as long as she was engaging in various forms of sexual activity with Mrs. Dorsey. These activities, including kissing, touching, oral sex and intercourse with the use of a dildo, occurred in Mrs. Dorsey's office and in her van on deserted dirt roads, as well as in appellants' homes and boat. At some point Mr. Dorsey ("Papa" to Little Wendy) joined the activities occurring at home, engaging in oral, vaginal and anal sex with the victim.

The evidence at Mr. Dorsey's trial was similar, but by that time — approximately eight months after Mrs. Dorsey's trial — the victim's doctors had discovered additional personalities. In particular, a third personality called "Trouble" was identified. Trouble comes out when Little Wendy or any of the others are being physically hurt because she feels no pain. Mr. Dorsey testified at his trial and admitted having sexual relations with the victim but stated that their activities were consensual.

1. The victim testified against the Dorseys in a dissociative state, and both appellants challenge the admissibility of such testimony. Specifically, appellants argue that a dissociative state is like a hypnotic trance, and since "[s]tatements made by a person while in a hypnotic trance are inadmissible, as 'the reliability of hypnosis has not been established' [cits.]," *Bobo v. State*, 254 Ga. 146, 148 (3a) (327 SE2d 208) (1985), testimony from a person while in a dissociative state should also be inadmissible. See also *Harper v. State*, 249 Ga. 519 (1) (292 SE2d 389) (1982) (statement made by person taking "truth serum" not admissible because it was not established that persons taking the drug will in fact tell the truth while under its influence). Although appellants call our attention to expert testimony that a dissociative state is similar to hypnosis or a trance state in that all three involve alterations in consciousness, the same expert testified that, beyond that, they are "not at all the same thing." Another expert testified that there was no real correlation between a dissociative disorder that is a multiple personality disorder and hypnosis. The most important difference for our purposes is that hypnosis is a pro-

cess a person voluntarily chooses to engage in yet which is externally imposed, while a dissociative state is involuntary and, although triggered by external stimuli, comes solely from within. We believe the nonvolitional nature of a dissociative state itself makes statements made while in such a state inherently more reliable than statements made in a hypnotic trance. Moreover, unlike the statements made in the hypnosis and truth serum cases relied on by appellants, in both of these trials the victim's testimony in a dissociative state could be tested for reliability. In the cases cited by appellants for the proposition that statements made in a hypnotic trance are inadmissible, the statements at issue were hearsay: the question presented was whether someone should be allowed to testify at trial regarding what was recalled and said by himself or another while in an artificially induced altered state of consciousness at an earlier time. Thus, in addition to concerns about the inherent reliability of the statement, those cases also involved concerns about the impossibility of testing that reliability due to the jury's inability to see the declarant in the altered state making the statement and the opposing party's inability to cross-examine the declarant in the state he was in at the time the statement was made. See *United States v. Swanson*, 572 F2d 523, 527-528 (5th Cir. 1978). In the instant cases, these concerns do not arise because the victim actually testified in a dissociative state, giving the jury the opportunity to see and evaluate her demeanor, and, as will be discussed further below, appellants were given the opportunity to cross-examine the victim in a dissociative state. We therefore conclude that, for purposes of the cases under consideration, the line of cases holding that statements made by a person in a hypnotic state are inadmissible does not control the admissibility of the victim's testimony in a dissociative state.

Perhaps not surprisingly, we could find no law in any jurisdiction regarding the admissibility of testimony from a witness in a dissociative state. We start with a presumption, however, that because the goal of a trial is to ascertain the truth, "[a]ny evidence is admissible which logically tends to prove or disprove any material fact which is at issue in the case." *Westerfield v. State*, 176 Ga. App. 195, 196 (2) (335 SE2d 702) (1985). Furthermore, " '[a]dmissibility of evidence is a matter which rests largely within the sound discretion of the trial court. . . . (Cit.)' [Cit.]" *Johnson v. State*, 204 Ga. App. 277 (1) (419 SE2d 118) (1992). With these principles in mind, we conclude that the challenged testimony was sufficiently reliable to be admissible. There was undisputed expert testimony at both trials that the victim in a dissociative state would not lie. The reliability of the victim's statement in a dissociative state was also supported in both trials by numerous prior consistent statements. Furthermore, the jury was able to observe the victim while she testified, and appellants had the op-

portunity to test the reliability of her testimony through cross-examination. The trial court properly recognized that if testimony from a person in a dissociative state is never admissible, even if sufficient indicia of reliability are present, persons aware of someone's dissociative disorder will be able to take advantage of that condition with impunity. This we cannot allow. We therefore conclude that the trial court did not abuse its discretion in admitting the testimony of the victim in a dissociative state.

We have twice alluded to appellants' opportunity to cross-examine the witness in each dissociative state in which she testified. At Mrs. Dorsey's trial, the victim went into a dissociative state when the prosecutor began to ask her about sexual activity and Pawpaw and presented the majority of her direct testimony as Little Wendy. When Mrs. Dorsey's attorney began cross-examination of the victim after a recess, the victim, no longer in a dissociative state, could not remember her prior testimony as Little Wendy. Mrs. Dorsey's motion for mistrial was denied, and her counsel continued to cross-examine the victim as Big Wendy. After Big Wendy testified that she was not sure if she could bring Little Wendy back, a second motion for mistrial was denied. On redirect, the prosecutor elicited testimony from Big Wendy that Mrs. Dorsey knew how to trigger a dissociative state and had done so many times. The questions regarding Mrs. Dorsey and how she brought out Little Wendy by talking about Pawpaw themselves brought out Little Wendy, and the prosecutor then turned the witness over to the defense for a full cross-examination. At Mr. Dorsey's trial, each of the three personalities that appeared and testified — Big Wendy, Little Wendy and Trouble — was made available for cross-examination, but Mr. Dorsey's counsel chose not to ask any questions based on his position that testimony from a witness in a dissociative state was not admissible and that the victim was not competent to testify. From these facts in the record, we conclude appellants had ample opportunity to cross-examine the witness in each dissociative state in which she testified and emphasize that we probably would have been compelled to reach a different conclusion had appellants not been given this opportunity.

2. In two enumerations of error, Mrs. Dorsey additionally argues that the trial court erred in failing to instruct the jury that it should disregard evidence obtained through hypnosis and testimony from a witness in a hypnotic-type trance. As discussed in Division 1, however, we do not agree with Mrs. Dorsey's contention that a hypnotic state and a dissociative state are essentially the same thing for purposes of admitting or evaluating testimony. Thus, the requested instructions were not applicable to the facts presented, and the trial court did not err in refusing to give them.

3. Both appellants also contend the victim was incompetent to

testify based on expert testimony that she suffers from a mental disease and that she may at times, while in a dissociative state, have incomplete or distorted perceptions of what is happening. However, a mental disease does not necessarily render a witness incompetent to testify. " 'Everyone is presumed competent to testify, and even where a person is shown to have been insane, or to have been adjudged insane previously and is presently in a state mental hospital, this does not necessarily render such person incompetent to testify. [Cit.]' [Cit.] 'The competency of a witness shall be decided by the court,' OCGA § 24-9-7 (a), and the decision of the trial court will not be disturbed unless there is an abuse of discretion. [Cit.]" *Flynn v. State*, 255 Ga. 415, 419 (7) (339 SE2d 259) (1986). If the allegedly incompetent person understands her obligation to tell the truth and is capable of giving material evidence upon the subject matter in question, she is competent to testify, and it is then up to the jury to determine the appropriate weight to give her testimony. See *Cuesta v. Goldsmith*, 1 Ga. App. 48 (3) (57 SE 983) (1907). At both trials there was testimony from the victim and others indicating that she could and did understand her obligation to tell the truth and that in a dissociative state she could remember what happened to her previously in a dissociative state and truthfully relate this material evidence to the jury. Accordingly, the trial court did not abuse its discretion in finding the victim competent to testify in each trial. That the victim's perceptions in a dissociative state might sometimes be incomplete or distorted was a proper subject of argument to the jury regarding why it should discount her testimony, but it did not render the victim incompetent to testify. See *Cuesta*, supra.

Nor did the trial court err in the procedures it used to reach its conclusion that the victim was competent. In Mrs. Dorsey's trial, the court did not examine the victim and determine her competency prior to her testimony, see OCGA § 24-9-7 (b), because Mrs. Dorsey did not object to the victim's competency prior to the victim's testimony. When Mrs. Dorsey finally objected to the victim's competency to testify, several days into the trial and long after the victim's testimony was complete, the trial court properly ruled that Mrs. Dorsey had waived her right to a pre-testimony examination of the victim's competency. See *Redfield v. State*, 240 Ga. 460 (3) (241 SE2d 217) (1978). Contrary to Mrs. Dorsey's assertions, however, the trial court did not then refuse to rule on the victim's competency and leave it as a jury question. Rather, the court concluded that a determination of competency could be made based on the testimony of the victim and others already presented and ruled that the victim was not incompetent. In Mr. Dorsey's trial, where the objection to the victim's competency was properly raised prior to her testimony, the trial court examined and ruled competent the victim's host personality (the victim not in a dis-

sociative state) as well as each of the two other personalities that emerged and testified when the victim was in a dissociative state.[1] Thus, we conclude appellants' enumerations of error relating to the trial court's rulings on the victim's competency are without merit.

4. At the beginning of his trial, Mr. Dorsey objected to the State's presentation of evidence of similar transactions on the grounds that the State's notice of its intention to do so pursuant to Uniform Superior Court Rule 31.3 was not sufficiently specific with respect to dates on which the similar transactions occurred. The similar transactions in question were incidences of sexual conduct between the victim and appellants not charged in the indictment but part of the same pattern of abuse. Mr. Dorsey contends the trial court erred in ruling that no notice was necessary under Rule 31.3 (E) because the similar transactions were part of a single continuous transaction. See *Dempsey v. State*, 197 Ga. App. 674 (1) (399 SE2d 239) (1990). Even if this ruling were error, however, it would be harmless because the notice provided was sufficient. "While the dates given in the notice were not specific, 'the prosecution did not have specific dates of similar transactions in its possession. In revealing to appellant the information which it had, the prosecution complied with Rule 31.3. [Cits.]' [Cit.]" *Patten v. State*, 184 Ga. App. 152, 154 (3) (361 SE2d 203) (1987).

Mr. Dorsey also contends that testimony regarding sexual conduct between the victim and Mrs. Dorsey in which he was not involved was irrelevant to his guilt or innocence and should not have been admitted in his trial. This evidence was relevant, however, for it established a background pattern of sexual abuse against which the inference that Mr. Dorsey committed the charged acts of sexual abuse was more probable than it would have been without the evidence. See *Southern R. Co. v. Lawson*, 256 Ga. 798 (4) (353 SE2d 491) (1987).

5. Mr. Dorsey's ninth enumeration of error, that the trial court improperly allowed the victim witness coordinator from the prosecutor's office to sit with the victim during her testimony, is also without merit. See *Miles v. State*, 201 Ga. App. 568 (5) (411 SE2d 566) (1991).

6. Mr. Dorsey additionally argues that the trial court erred in instructing the jury that force could be found from a continuing set of circumstances involving force or threats of bodily harm; that a lack of

---

[1] Mr. Dorsey argues that the trial court improperly refused to rule on the victim's competency prior to her testimony. Our review of the record suggests his characterization of the course of events is not accurate. Instead, there seems to have been a general agreement that the better procedure would be to examine and rule on the competency of the victim and each of the victim's personalities as they appeared at trial rather than having a separate hearing in which the court and parties would have to anticipate which personalities would emerge at trial and attempt to bring them out prior to trial simply to assess their competency to testify. To the extent Mr. Dorsey did not agree to this procedure, we approve it as a logical way to deal with a difficult and unique situation.

resistance induced by fear is not legally cognizable consent but is force; and that substantial violence on the part of the accused or vigorous resistance on the part of the female is not required to find rape if forcible intercourse is otherwise found. Acknowledging that these instructions are accurate statements of law, Mr. Dorsey argues that they are not authorized by any evidence presented. However, this argument would only be valid if the testimony of the victim in a dissociative state were inadmissible, for that testimony provides ample evidence of force and fear of force. Because we have held the evidence of the victim in a dissociative state admissible, this challenge to the jury instructions regarding force is also rejected.

7. Both appellants raise the general grounds with respect to each count on which they were convicted. Viewing all the evidence, including the testimony of the victim, in a light most favorable to the verdicts, rational jurors could have found appellants guilty of each count on which they were convicted beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

8. Lastly, both appellants enumerate as error the trial court's award of restitution to the victim as a condition of probation pursuant to OCGA § 17-14-1 et seq. Specifically, they first contend that the victim's damages were not proximately caused by appellants' criminal acts. "Damages" in the restitution context "means all damages which a victim could recover against an offender in a civil action . . . based on the same act or acts for which the offender is sentenced. . . ." OCGA § 17-14-2 (2). Appellants say the victim's injuries were caused by the childhood abuse of the victim by her grandfather rather than their later acts. There can be more than one proximate cause of an injury, however. *Church's Fried Chicken v. Lewis*, 150 Ga. App. 154, 157 (1B) (256 SE2d 916) (1979). Moreover, proximate cause is a question of fact for the factfinder. Id. The trial court found as fact that the victim was injured by and has incurred costs as the result of appellants' criminal behavior toward her, and this finding is not clearly erroneous.

Appellants also contend that restitution is barred by the two-year statute of limitation applicable to tort actions and that restitution is improper because of appellants' poor financial condition. There is nothing in the statutory or case law on restitution to suggest that restitution cannot be awarded after the statute of limitation for an analogous civil action has run. Although the amount of damages suffered by the victim, which is one consideration in establishing the appropriate restitution amount and sets the upper limit for that amount, is ascertained by looking to the amount of damages available in an analogous civil action, restitution is not synonymous with a civil action and does not preclude a separate civil action. See *Morrison v. State*, 181 Ga. App. 440, 441 (352 SE2d 622) (1987). Furthermore, the trial

court's written findings and the transcripts of the restitution hearings show that the trial court heard and considered evidence and argument regarding appellants' financial condition. The State requested more than one million dollars in restitution and supported its request with bills and expert testimony regarding the victim's prognosis. Based primarily on its assessment of appellants' present financial condition and their probable future earnings capacity, the trial court determined that the total restitution amount for both appellants would be less than one hundred thousand dollars. Accordingly, appellants' argument that the trial court's restitution award was improper is without merit.

*Judgments affirmed. Sognier, C. J., concurs. McMurray, P. J., concurs in judgment only.*

DECIDED NOVEMBER 25, 1992 —
RECONSIDERATION DENIED DECEMBER 14, 1992

*Robert E. Andrews*, for appellant.
*C. Andrew Fuller, District Attorney, Anne M. Bishop, Lee Darragh, Assistant District Attorneys*, for appellee.