Ruth Kay WALL, and Sandra Slavik, Appellants,

v.

FAIRVIEW HOSPITAL AND HEALTH-CARE SERVICES, d/b/a Fairview–Riverside Medical Center, a nonprofit corporation, et al., Defendants,

Kathy House, R.N., Respondent.

Nos. CX–96–1137, C1–96–1138.

Court of Appeals of Minnesota.

Aug. 26, 1997.

Review Granted Oct. 21, 1997.

Sheila Engelmeier, Thomas E. Marshall, Nancy A. Newark, Mackall, Crounse & Moore, PLC, Minneapolis, for Appellants.

Kay Nord Hunt, Phillip A. Cole, Lommen, Nelson, Cole & Stageberg, P.A., Minneapolis, for Respondent.

Considered and decided by AMUNDSON, P.J., and NORTON and PETERSON, JJ.

## OPINION

NORTON, Judge.

Former patients sued a nurse for negligence and violation of the Vulnerable Adult Act. They contend the trial court erred in granting a directed verdict in favor of the nurse. In a notice of review, the nurse alleges the trial court abused its discretion in various evidentiary rulings. We affirm in part, reverse in part, and remand.

## FACTS

In 1993, appellants Sandra Slavik and Ruth K. Wall brought this action against the estate of their psychiatrist, Dr. William Routt, his nurse, respondent Kathy House, R.N., and Fairview Hospitals. House was Dr. Routt's sole nurse and assistant from 1985 until Dr. Routt committed suicide in 1991. Appellants began receiving treatment from Dr. Routt when they were hospitalized for depression and suicidal tendencies.

Their complaint against the doctor alleged violation of the Vulnerable Adult Act, Minn. Stat. § 626.557(VAA); negligent selection, appointment, and/or supervision; negligent and intentional infliction of emotional distress; professional malpractice; sexual assault; sexual exploitation; ratification; respondeat superior; and punitive damages based on Dr. Routt's alleged sexual abuse and mistreatment of the two patients. The complaint also alleged that House, as the doctor's sole nurse and assistant, was aware of the doctor's alleged malpractice, mistreatment, and abuse of Slavik and Wall, yet she failed to intervene or report the problem. They contend that, by these acts of omission, House negligently permitted Dr. Routt to abuse the victims and breached her duty as a nurse to patients under the VAA.

Before trial, the district court granted Fairview's motion for summary judgment on all claims, granted House's motion for summary judgment on the negligent permission claim, subsumed the malpractice claims into the claims under the VAA, denied House's motion for summary judgment in all other respects, and granted appellants' motions to amend their complaint to add a claim for punitive damages against House.

Sandra Slavik was 38 years old at the time trial began in 1995. She is married and has two teenage children. Slavik had been physically, emotionally, and sexually abused as a child at the hands of her father, stepmother, and neighbor. As an adult, she struggled with depression and attended in-patient chemical dependency treatment three times to address her addiction to prescription drugs. Slavik began seeing Dr. Routt as her in-patient psychiatrist in early 1990, after she was hospitalized due to problems that developed in an aftercare session. Between that time and when she terminated treatment with Dr. Routt in the spring of 1991, Slavik was hospitalized 18 times.

Ruth K. Wall was 45 years old at the time of trial. She is married with two children. Wall has a history of sexual and physical abuse at the hands of a farm worker and her grandfather, emotional abuse by her mother, and rape by a blind date in college. Wall began psychiatric counseling because she was anorexic and was dealing with grief over the death of newborn twin babies and other unexplainable memories and feelings. She worked with various therapists and psychiatrists before she was referred to Dr. Routt as her in-patient therapist. Dr. Routt treated Wall from 1988 until shortly before his death in 1991. Under Dr. Routt's care, Wall was hospitalized more than ten times.

Both Slavik and Wall have been diagnosed with multiple personality disorder (MPD), which is now known as dissociative identity disorder (DID). The Diagnostic and Statistical Manual of Mental Disorders (DSM–IV) explains that the essential feature of DID is "the presence of two or more distinct identities or personality states * * * that recurrently take control of behavior." The jury heard various experts testify about DID and its effects. A person with DID experiences a "failure to integrate various aspects of identity, memory, and consciousness." Through therapy, Slavik and Wall came to dissociate and identify numerous alternate personalities, commonly referred to as "alters." Slavik's alters include Mary, Jessica, Elizabeth, Kate, Amelia, Grandma, and Anne. Wall's alters include: Tootie Kay, Michael/Michelle, Kay, The Little Girls, Prudence, The Destroyer, Perseverance, the Silent One, and Daniel/Ruth.

Individuals with DID may "manifest posttraumatic symptoms (e.g. nightmares, flashbacks, and startle responses) or Posttraumatic Stress Disorder. Self-mutilation and suicidal and aggressive behavior may occur." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 485 (4th ed.1994). One of Wall's psychologists, Dr. Carol Swenson, testified that patients with dissociative disorders have an

internal turmoil that causes them to cut themselves. Both women suffered from suicidal ideation and repeatedly mutilated themselves while dissociating; Slavik routinely burned her arms with cigarettes, and both she and Wall cut the skin on their bodies repeatedly with Exacto knives. Dr. Swenson testified that Wall often cut herself out of fear that she would reveal something she should not. "[F]or her to reveal anything frightened her and she would punish herself, probably in an effort to appease who she thought would punish her for revealing information." During their course of treatment with Dr. Routt, Slavik's and Wall's levels of agitation and self-destruction increased.

At trial, Slavik and Wall testified that, during their therapy sessions, Dr. Routt would either hypnotize them or call forth their alter personalities without hypnosis, sexually abuse them, and swear them to secrecy while in their dissociative state. Slavik explained that Dr. Routt would say to her alters:

> Okay, Mary, I want you to listen to me, and I want everyone else to listen to me. Anything that we did today or talked about today has got to be kept between us. Mary, you are to remember nothing, just that we had a conversation about you relaxing, and nobody else is to remember anything or tell anybody else. And when I say "anybody else," that means your husband, that means Bette, that means any other doctor that you would see or anybody.

In addition to observing Slavik and Wall as they testified, the jury had the opportunity to observe Slavik and Wall testify in their dissociative states. Counsel called forth Slavik's and Wall's various alters, who each was then subjected to direct- and cross-examination. The alters testified to the abuse that Dr. Routt had perpetrated against them.

Counsel for Slavik called forth: Jessica, who witnessed the abuse of Elizabeth; Elizabeth, age four, who testified to sexual abuse from Slavik's father and Dr. Routt; and Anne, age ten, who testified to abuse by Dr. Routt. Anne testified that Dr. Routt drank clear alcohol during therapy. When Eliza-

beth began to testify, she asked for "John," who is John Slavik, Sandra Slavik's husband. The court allowed John to stand next to Elizabeth, while she testified. Elizabeth testified that, during therapy, when she was nervous or scared about touching Dr. Routt as he directed, he would "put a needle in me and then I wasn't as scared anymore."

Similarly, counsel for Wall was able to call out: Kay, age eight, who testified to abuse by Dr. Routt, both in his office and in the general "smoking room" in the hospital; Tootie Kay, age three, who testified that, in addition to Wall's grandfather and another man, the doctor abused her and "the Little Girls" and told them to keep his conduct a secret; and Michael, a teenager, who witnessed the doctor abuse Kay and the Little Girls. When Kay began to testify, she requested a special soft shirt of a friend because he "makes me feel safe. Makes us feel safe."

Slavik and Wall dissociated upon request at trial; they were not hypnotized.

Evidence at trial revealed that Dr. Routt struggled with depression and suicidal tendencies. During therapy sessions, he told Slavik and Wall of his deep sorrow over the suicide death of his daughter, his loveless and failing marriage, his resentment toward his wife, the sexual abuse he experienced as a child, and his desire to die. Slavik did not perceive this sharing of information inappropriate; she felt the doctor was able to relate better to her because he could share his experiences and feelings that were often similar to her own. Both women testified to repeated instances of comforting Dr. Routt. Even their alter personalities testified to Dr. Routt's sadness and their desire to comfort him and "make him happy" by granting him sexual favors.

Evidence also suggested that Dr. Routt's psychological condition affected his professional judgment. In addition to drinking alcohol in the presence of Slavik and Wall, the doctor offered alcohol to them and their alters during therapy. Numerous other witnesses, both patients and co-workers, testified to the fact that Dr. Routt regularly smelled of alcohol and, occasionally, exhibited

slurred speech, confusion, and disorientation on the job.

Dr. Routt carried on a personal and sexual relationship with another patient, E.M., for four years, concurrent with his treatment of Slavik and Wall. House knew of their relationship. E.M. testified that Dr. Routt smelled of alcohol "practically every time" he met with her in his office or in the hospital. In addition to seeing Dr. Routt drink alcohol in the office, E.M. testified that they used cocaine together in the office and socially, outside the office. E.M. testified that House was present while Dr. Routt drank alcohol. E.M. also described one instance in which House came into his office to get something out of his desk and, in so doing, reached right past a vial of cocaine that he kept in that drawer.

Slavik, Wall, and E.M. all described having an affectionate relationship with Dr. Routt that included occasional hand holding, hugs, and kisses. Wall told a friend that she was in love with Dr. Routt and that he made her feel special because, in breaking down over his own issues, he allowed her to comfort him by cuddling him, letting him put his arm around her, letting him put his head in her lap, and stroking his temples to comfort him. E.M. testified that Dr. Routt gave her a hug or kissed her on the mouth or on the cheek every time they met. House witnessed these embraces. House and Dr. Routt told E.M. that "it was improper" to discuss with other people the physical contact that occurred between Dr. Routt and E.M. House also heard Dr. Routt complain to E.M. during therapy about his unhappy marriage, talk about his sexual abuse as a child, and offer to prescribe medication for E.M. Dr. Routt told E.M. his relationship with House was "a partnership and kind of like a father/daughter incestuous kind of thing."

The doctor's receptionist, Judy Rosebrock, never saw Dr. Routt use alcohol, but she was concerned that he was using, because his office smelled like smoke and alcohol. After Dr. Routt's suicide, House told Rosebrock that she had been very concerned about Dr. Routt and had noticed that his eyes were jaundiced. House was sad and angry over Dr. Routt's death because "maybe she could

have tried harder." House told Rosebrock that she needed to clean out the doctor's office at his wife's request. Insisting on completing the task alone, House locked herself inside his office. When Rosebrock came to the door to ask again if she could help, she had the opportunity to see various packing boxes, one of which contained alcohol bottles. House sealed the boxes and moved them into the hallway, so Rosebrock never got a closer look at the bottles of alcohol.

In her capacity as Dr. Routt's nurse, House did rounds at the hospital with him and took notes during his therapy sessions with the patient. She would make the rounds at the hospital with or without Dr. Routt. She also had personal sessions with patients in the medication clinic once per week.

House testified that she understood her duty under the law to report a physician who compromised the safety of a patient or who was intoxicated with a patient or used narcotics when treating a patient, or was impaired in such a way that his medical practice would affect the patient's safety. She also acknowledged her duty to report physical, emotional, verbal, or sexual abuse of a patient, but House considered Slavik and Wall to be vulnerable adults only while they were hospitalized.

Contrary to the testimony of the other witnesses, House denied ever smelling alcohol on Dr. Routt, seeing him use alcohol, or seeing him intoxicated. She claimed that she never cleaned any liquor bottles out of his office. She further claimed that Dr. Routt never spoke with her of his childhood sex abuse or marital problems. He did tell her that someone reported him to the Impaired Physicians Committee at Fairview–Riverside after they woke him up at 3:00 a.m. and he spoke with slurred speech. House attributed his slurred speech to the medication that he was taking for bronchitis at that time. Contrary to E.M.'s testimony, House testified that, as far as she knew, Dr. Routt never took a patient out socially or engaged in sexual behavior with a patient. She denied ever seeing Dr. Routt kiss a patient. House never saw Dr. Routt hug a patient face-to-face.

Another patient of Dr. Routt, James Konkler, confirmed that House was present whenever Dr. Routt had a session with him in the hospital. During these sessions, Konkler said Dr. Routt always smelled of alcohol and occasionally appeared "[c]onfused, muddled, glassy-eyed," and exhibited slurred speech.

Wall moved out of her family home during the course of her treatment and lived with Konkler from 1990 through 1992. At some point, Slavik also roomed with them. While they were living together, Konkler informed Dr. Routt's office that he was contemplating suicide and had a gun and bullet to do so. Slavik and another patient called Dr. Routt's office to express concern over Wall's safety because they had strongly warned Konkler against being involved with Wall, due to her prior sexual abuse. Konkler testified, however, that neither House nor Dr. Routt ever discussed the phone calls with him. Dr. Routt did explain to Konkler that, in his opinion, the relationship was not a good idea and Konkler should leave Wall alone.

Months after Dr. Routt's death, Wall sensed that the doctor may have abused her. She told a friend that she felt that they had had sexual contact during a session. When House heard of Wall's allegations against Dr. Routt, she called her and attempted to dissuade her from revealing any such information. House's call scared Wall and made her cry.

Both Slavik and Wall were severely traumatized by the news of Dr. Routt's suicide. They blamed themselves for his death. Slavik's husband testified that her condition "[d]eteriorated greatly" after Dr. Routt's death. She experienced "[m]ore cutting, more burning, more flashbacks. Completely dysfunctional. The worst. More hospitalizations."

At the close of appellants' case at trial, the court granted House's motion for a directed verdict, ruling that appellants had presented insufficient evidence to maintain their claims for emotional distress and violation of the VAA. Trial continued on the claims against the estate of Dr. Routt. The jury ultimately found that Dr. Routt had violated the VAA, intentionally and negligently inflicted emotional distress on appellants, and committed professional malpractice, battery, and sexual exploitation. The jury awarded Slavik and Wall $4.4 million in damages against the estate of Dr. Routt.

## ISSUES

1. Is this case rendered moot by the fact that appellants obtained satisfactions of judgment against Dr. Routt's estate?

2. Did the trial court err in directing a verdict in favor of House?

3. Did the trial court err in subsuming appellants' negligence and malpractice claims into the violation of the VAA claim?

4. Did the trial court abuse its discretion in allowing Slavik and Wall to testify in dissociative states?

5. Did the trial court abuse its discretion in awarding House costs and disbursements to cover her use of a computerized documentary retrieval system?

## ANALYSIS

### 1. Mootness

House contends this appeal is moot because the satisfaction of judgment that Slavik and Wall obtained against Dr. Routt's estate satisfies all other claims for the same cause. *Lovejoy v. Murray*, 3 Wall. 1, 70 U.S. 1, 11, 18 L.Ed. 129 (1865). We disagree. The Minnesota Supreme Court rejected that approach to satisfactions in *Gronquist v. Olson*, 242 Minn. 119, 126, 64 N.W.2d 159, 164 (1954). There, the court held:

> The just and true rule should be, and we believe is, that, if the injured party has accepted satisfaction in full for the injury suffered by him, the law will not permit him to recover again for the same injury; but if he has not received full satisfaction, or that which the law considers such, he is not barred until he has received full satisfaction. If he receives a part of the damages from one of the wrongdoers, the receipt thereof not being understood to be in full satisfaction of the injury, he does not thereby discharge the others from liability.

*Id.* The supreme court noted that the key factors in determining whether a release of

one joint tortfeasor will operate to release another are: the intention of the parties to the release instrument and whether the injured party has received full compensation for the injury. *Id.* at 128, 64 N.W.2d at 165.

> If we apply that rule, then, when one joint tortfeasor is released, *regardless of what form that release may take,* as long as it does not constitute an accord and satisfaction or an unqualified or absolute release, and there is no manifestation of any intention to the contrary in the agreement, the injured party should not be denied his right to pursue the remaining wrongdoers until he has received full satisfaction.

*Id.*

■ Slavik and Wall entered into a settlement agreement with Dr. Routt's estate in which they signed *Pierringer* releases and obtained satisfactions of judgment against the estate for $875,000 each. In each *Pierringer* release, the parties agreed:

> [T]his Release and Settlement Agreement is not a release of [Slavik's and Wall's] claims against [House]. Claimant intends to proceed with her appeal against House, which appeal is currently pending at the Minnesota Court of Appeals * * *. * * * This *Pierringer* Release is not entered into, nor any way intended, to release any claim or cause of action by Claimant against House for damages sustained as a result of the occurrence described by Claimant in the Lawsuit, said claims and causes of action being specifically reserved and retained against House; said *Pierringer* Release only releases, and is only intended to release, all claims against [Dr. Routt's estate and his insurer] for damages sustained as a result of the occurrence described by Claimant in the Lawsuit or which could have been described therein.

The language of the release clearly sets forth the parties' intention that Slavik and Wall have retained their claim against House and do not consider the satisfaction of judgment against Dr. Routt's estate to affect in any way their claim against House. "Where the intention of the parties is clear from the contents of the instrument, it ought not to be necessary to resort to legal fiction in order to reach just and proper results." *Gronquist,*

242 Minn. at 128, 64 N.W.2d at 165. In addition, Slavik and Wall have meritorious claims against House and, as yet, have not received full compensation for their injuries. Consequently, the satisfaction of judgments against Dr. Routt's estate does not affect the viability of this appeal.

■ In a related matter, House moves the court to strike the *Pierringer* releases from the reply brief appendix, arguing that they are not appropriately part of the record on appeal because they were not part of the trial court file. *See* Minn. R. Civ.App. P. 110.01 (defining record on appeal as all papers filed in trial court, exhibits, and transcript of proceedings below). Slavik and Wall included the *Pierringer* releases in their reply appendix in response to the satisfaction of judgment documents that House included in her appendix. Notably, the satisfaction of judgment documents were not part of the record on appeal either. Although both sets of documents were not before the trial court when it issued the decision we are reviewing, we may review these documents to determine whether we have a live controversy before this court. *See In re Inspection of Minn. Auto Specialties, Inc.,* 346 N.W.2d 657, 658 (Minn.1984) (court considers events that occur while appeal is pending and may render case moot). Therefore, we properly consider these documents only to establish that the satisfaction of judgments against Dr. Routt's estate does not render this appeal moot.

## 2. Directed Verdict

■ Slavik and Wall challenge the directed verdict in favor of House on the claims of violation of the VAA and negligent and intentional infliction of emotional distress. A motion for directed verdict presents the trial court with a question of law regarding whether the evidence is sufficient to present a fact question for the jury to consider. *M.W. Ettinger Transfer & Leasing Co. v. Schaper Mfg., Inc.,* 494 N.W.2d 29, 34 (Minn. 1992). When reviewing a directed verdict, the appellate court must view the evidence in a light most favorable to the nonmoving party and determine independently whether an issue of fact exists for trial. *Baber v. Dill,* 531 N.W.2d 493, 495 (Minn.1995). "If fact

questions exist, a directed verdict is reversible error." *Id.*

### a. Violation of the VAA

The VAA protects adults who

because of physical or mental disability or dependency on institutional services, are particularly vulnerable to abuse and neglect; to provide safe institutional or residential services or living environments for vulnerable adults who have been abused or neglected; and to assist persons charged with the care of vulnerable adults to provide safe environments.

In addition, it is the policy of this state to require the reporting of suspected abuse and neglect of vulnerable adults, to provide for the voluntary reporting of abuse or neglect of vulnerable adults, to require the investigation of the report, and to provide protective and counseling services in appropriate cases.

Minn.Stat. § 626.557, subd. 1 (1990). To fulfill its purpose of protecting vulnerable adults, the VAA requires professionals, their delegates who care for vulnerable adults, or employees providing services in a facility to report suspected abuse or neglect if they know of or have reasonable cause to believe that a vulnerable adult has been or is being abused or neglected, or know that a vulnerable adult has a physical injury that is not explainable by their history of injuries. *Id.,* subd. 3. A person who intentionally fails to report is guilty of a misdemeanor, and a person who negligently or intentionally fails to report neglect or abuse is liable for damages caused by that failure. *Id.,* subd. 7(a), (b). Furthermore, any caretaker or employee thereof who intentionally abuses or neglects a vulnerable adult, or knowingly permits conditions to exist that result in the abuse and neglect of a vulnerable adult, is guilty of a gross misdemeanor. *Id.,* subd. 19.

The trial court directed a verdict in favor of House based upon its conclusion that: (1) she did not have reasonable cause to know that abuse had occurred or was occurring to Slavik and Wall and (2) if she did have such knowledge, Slavik and Wall failed to establish that they were vulnerable adults at the time that she had that knowledge. Slavik and Wall contend these conclusions are erroneous and argue that the trial court improperly weighed the evidence, evaluated witness credibility, and viewed the evidence in favor of House rather than Slavik and Wall. We agree.

Our first inquiry reveals that the trial court erroneously concluded that Slavik and Wall failed to establish that they were vulnerable adults. A "vulnerable adult" is any person 18 years of age or older who "is unable or unlikely to report abuse or neglect without assistance because of impairment of mental or physical function or emotional status." Minn.Stat. § 626.557, subd. 2(b)(4).[1] House claims that the women were vulnerable adults only when they were hospitalized. The psychologists who were treating Wall and Slavik testified, however, that the women are vulnerable adults by virtue of the fact that they suffer from DID. Dr. Carol Swenson, Bette Hansen, and Dr. Gary Blackmore all testified to the women's status as vulnerable adults. Dr. Swenson noted that people with DID are continuously vulnerable adults because they can and do dissociate at any time. Dissociation may occur when the least incident triggers a memory or response in the person's mind. This impairment could render them unable or unlikely to report abuse or neglect at any time. Viewing this evidence in a light most favorable to Slavik and Wall, we conclude that their status is at all times that of vulnerable adults, strictly because of their mental illness.

Our next inquiry is whether Slavik and Wall met the definition of abused or neglected under the VAA. The statute defines "abuse" to include any form of criminal sexual misconduct under the criminal statute as well as any sexual contact between a facility staff person and a resident or client, or nontherapeutic, nonaccidental conduct that produces or reasonably could produce pain and injury, or any repeated conduct that produces or reasonably could produce mental or emotional distress. *Id.,* subd. 2(d)(1), (2),

1. The Minnesota legislature repealed subdivision 2 of section 626.557; definitions for section 626.557 are now located in Minn.Stat. § 626.5572 (1996).

**204**

(3). The VAA defines "neglect" as a caretaker's failure to supply a vulnerable adult with necessary food, clothing, shelter, healthcare, or supervision. *Id.,* subd. 2(e)(1). The record shows, and the jury verdict against the estate of Dr. Routt confirms, that Dr. Routt committed heinous acts of abuse against Slavik and Wall under the guise of psychiatric treatment of their mental illness. He also violated personal and professional boundaries by burdening his patients with his personal problems, engaging in inappropriate nontherapeutic touch, and offering them alcohol and/or drugs during therapy. This evidence meets the definition of abuse and neglect.

 House approaches this case by attacking the credibility of various witnesses and arguing that Slavik and Wall were per se prone to concocting bizarre and incredible stories because they suffer from DID. Such arguments were better placed before the jury at trial. Neither this court nor the trial court engages in credibility determinations when evaluating a directed verdict. Credibility determinations are solely within the province of the jury. *See Young v. Wlazik,* 262 N.W.2d 300, 310 (Minn.1977) (credibility determinations rest with jury; trial court should "scrupulously avoid taking sides"). Moreover, the jury's verdict in favor of Slavik and Wall on every claim suggests, contrary to House's argument, that Slavik, Wall, and their witnesses were credible.

 Next, we consider if any issue of fact existed about whether House knew, had reasonable cause to believe, or suspected that Dr. Routt was abusing and/or neglecting Slavik and Wall. *See* Minn.Stat. § 626.557, subds. 1, 3 (mandating a report when person suspects, knows of, or has reasonable cause to believe that abuse or neglect has occurred). Sexual assault "will rarely be deemed foreseeable in the absence of prior similar incidents." *K.L. v. Riverside Med. Center,* 524 N.W.2d 300, 302 (Minn.App. 1994), *review denied* (Minn. Feb. 3, 1995). This court affirmed a directed verdict for the hospital in *K.L.* on the basis that the hospital owed the plaintiff no duty to prevent an unforeseeable risk of assault because the record contained no evidence that the hospital knew of any prior suspicious behavior by the assailant. *Id.* at 303.

 In this case, witness testimony revealed that House knew of Dr. Routt's sexual relationship with E.M., saw him kiss her as she came and left therapy sessions, heard him divulge his personal problems to her, and had seen him drink liquor during a session with her. Although Dr. Routt's conduct with E.M. does not prove that he committed the same conduct with Slavik and Wall, this prior inappropriate conduct made other similar conduct foreseeable, particularly with vulnerable patients when the doctor was under the influence of alcohol. *See id.* (prior similar incidents may make sexual assault foreseeable). The fact that House witnessed that type of conduct with one patient would tend to raise a reasonable inference that Dr. Routt might conduct himself in a similar way with other patients. Indeed, an earlier trial court judge allowed Slavik and Wall to amend their complaints to add claims for punitive damages because E.M.'s allegations had raised genuine issues of material fact about House's knowledge of Dr. Routt's alleged misconduct with at least one other patient.

The record reveals that House knew Slavik and Wall were concerned about Dr. Routt's emotional state because they asked her if she knew why he was so sad. Notably, however, although House routinely attended other patients' sessions with the doctor, she allowed his sessions with Slavik and Wall to proceed unmonitored. House further knew that Dr. Routt was the target of a complaint and investigation by Fairview–Riverside's Impaired Physicians Committee. The multiple references in the record to Dr. Routt's consumption of alcohol in his office and overt symptoms of being under the influence of alcohol raise an issue of fact as to how House could not have known that he had some alcohol dependency issues that may have affected his ability to treat his patients properly. Over and above Dr. Routt's physical appearance, receptionist Rosebrock testified that she noticed the odor of alcohol in Dr. Routt's office and saw House pack up a box of liquor bottles when she was cleaning out his office after his death.

On the witness stand, House flatly denied having any knowledge of the doctor's consumption of alcohol on the job or with his patients and denied any knowledge of inappropriate conduct by the doctor. She further denied packing up the liquor bottles. The discrepancies between her testimony and the testimony of the witnesses for Slavik and Wall created fact and credibility issues for the jury to determine. The trial court's role, upon the motion for directed verdict, was not to weigh her testimony against the testimony of the various other witnesses. Viewing the evidence in the light most favorable to Slavik and Wall, as the court must do when considering a directed verdict, the trial court had sufficient evidence before it to raise an issue of fact regarding whether House had reasonable cause to believe that Dr. Routt had abused and neglected Slavik and Wall.

Our final inquiry in this analysis of the violation of the VAA is whether House failed to report the abuse or neglect. The record is undisputed that House did not report any suspicion or knowledge of abuse and neglect of Slavik and Wall.

■ The trial court should reserve the directed verdict for the "exceptional case." *Marshall v. Galvez*, 480 N.W.2d 358, 360 (Minn.App.1992). The VAA gives caretakers of vulnerable adults a duty to make a report if they suspect or have reason to know of abuse and neglect. Given the evidence before the trial court that showed Slavik and Wall are vulnerable adults, that Dr. Routt abused and neglected them, and that House had reasonable cause to believe that Slavik and Wall could have been abused or neglected based on all surrounding circumstances, the trial court erred in directing a verdict in favor of House and dismissing the claim for violation of the VAA.

**b. Intentional and Negligent Infliction of Emotional Distress**

■ Wall contends the trial court erroneously directed a verdict for House on the claims of negligent and intentional infliction of emotional distress. A plaintiff must establish these elements to raise a claim for negligent infliction of emotional distress: she was within the zone of danger of physical impact;

she reasonably feared for her safety; and she suffered severe emotional distress that resulted in physical injury. *K.A.C. v. Benson*, 527 N.W.2d 553, 557 (Minn.1995). The court limits the zone of danger to plaintiffs who "have been in some actual personal physical danger caused by defendant's negligence." *Id.* at 558. The supreme court explains:

[C]ases permitting recovery for negligent infliction of emotional distress are characterized by a reasonable anxiety arising in the plaintiff, with attendant physical manifestation, from being in a situation where it was abundantly clear that plaintiff was in grave personal peril for some specifically defined period of time. Fortune smiled and the imminent calamity did not occur.

*Id.*

■ Wall contends she raised an adequate claim for negligent infliction of emotional distress because she showed that House allowed her to return to her living situation with Konkler even though House knew that Wall was vulnerable and susceptible to abuse, and that Konkler kept loaded weapons in the apartment. Wall alleges that she suffered damages as a result of House's neglect in allowing her to return to the zone of danger. The trial court correctly noted that Wall's living arrangements were outside the scope of therapy and were the result of Wall's voluntary choice. The VAA does not mandate reporting of verbal or physical aggression between patients or of self-abusive behavior unless such "abuse" causes serious harm. Minn.Stat. § 626.557, subd. 3a(b). This set of facts did not raise a claim for negligent infliction of emotional distress.

■ Wall also alleges that House's failure to report Dr. Routt caused her to remain in the zone of danger and sustain harm. Whether a plaintiff is within a zone of danger is an objective question. *K.A.C.*, 527 N.W.2d at 558. The general rule regarding a claim for negligent infliction of emotional distress allows a plaintiff to recover only if physical injury has occurred. *Langeland v. Farmers State Bank*, 319 N.W.2d 26, 31 (Minn.1982). The record reveals that Wall continued in therapy with Dr. Routt and,

consequently, continued to be abused by him. Although Wall testified that she did not fear for her own safety while in therapy sessions with Dr. Routt, her alters, who were present for the abuse, testified to the fear and anxiety she experienced over the abuse. The record also shows that the abuse she experienced with Dr. Routt seriously injured her and further exacerbated her mental illness. These facts establish a claim. Because we have already determined that House knew or had reason to know of the abuse and should have foreseen that Slavik and Wall were in the zone of danger, the trial court erred in directing a verdict on this claim for negligent infliction of emotional distress.

In order to establish intentional infliction of emotional distress, a plaintiff must prove the defendant intentionally or recklessly engaged in extreme and outrageous conduct that caused severe emotional distress. *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 438–39 (Minn.1983). Minnesota generally disfavors claims seeking damages for intentional infliction of emotional distress. *Mrozka v. Archdiocese of St. Paul & Mpls.*, 482 N.W.2d 806, 813 (Minn. App.1992), *review denied* (Minn. May 24, 1992). "Application of this tort is limited to those cases where the emotional distress is so severe that no reasonable person could be expected to endure it." *Id.* at 814.

Wall alleges that House's effort to dissuade her from reporting Dr. Routt's abuse constitutes "atrocious" conduct that "passes the boundaries of decency." *Hubbard*, 330 N.W.2d at 439. The record establishes that House's conduct was intentional; she initiated the phone call and warned Wall against divulging any information about her treatment with Dr. Routt. Wall testified that the phone call upset her to the point that she cried when she got off the phone. We may be able to agree that this conduct was extreme and outrageous, given the fact that House is a psychiatric nurse who sup-

posedly has the best interest of patients in mind. Wall's claim fails, however, because crying, by itself, does not demonstrate severe emotional distress. *See id.* (requiring severe emotional distress for viable claim). The trial court appropriately directed a verdict for House on Wall's claim of intentional infliction of emotional distress.

### 3. Negligence and malpractice claims

Slavik and Wall next allege the trial court erred in granting summary judgment against them on the claims of medical malpractice and negligent permission. The court ruled that the VAA provided their exclusive remedy and subsumed their negligence and malpractice claims against House into their VAA claim. Slavik and Wall argue that they are entitled to raise the medical malpractice and negligence causes of action independently because they presented sufficient evidence to substantiate them. On appeal from summary judgment, this court must determine whether genuine issues of material fact exist and whether the district court erred in its application of the law. *Wartnick v. Moss & Barnett*, 490 N.W.2d 108, 112 (Minn.1992).

In order to establish a medical malpractice claim, Slavik and Wall had the burden to present expert testimony demonstrating: the applicable standard of care for a nurse; that House departed from that standard of care; and that her departure from the standard of care caused their injuries. *Plutshack v. University of Minn. Hosps. & Clinics*, 316 N.W.2d 1, 5 (Minn. 1982). The trial court ruled that the only standard of care that Slavik and Wall established was the requirement under the VAA that House report any known or suspected abuse of a vulnerable adult. Minn.Stat. § 626.557. That ruling was correct; Slavik and Wall presented no expert testimony at the time of summary judgment to establish any other standard of care.[2] Therefore, in a

---

2. On review of summary judgment, Slavik and Wall urge this court to consider evidence presented at trial that allegedly raised issues of material fact over standards of care. They rely on Minn. R. Civ. P. 54.02 as the basis for this broader scope of review. We are not persuaded.

The district court renders summary judgment when:
> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that

case such as this, where plaintiffs failed to establish a duty of care for negligence or malpractice, and these claims and their accompanying damages are essentially the same as those claimed under the VAA, the negligence and malpractice actions are properly subsumed into the VAA claim for which a duty has been established.

 Slavik and Wall also challenge summary judgment on their negligent permission claim. They have rooted this claim in the statute that provides:

> This section applies to an action for damages commenced against a person who caused the plaintiff's personal injury * * * by * * * negligently permitting sexual abuse against the plaintiff to occur.

Minn.Stat. § 541.073, subd. 3 (Supp.1991). House was licensed to practice as a nurse and was employed by Dr. Routt. She had no administrative power to permit or preclude him from his actions. She did, however, have a duty to her patients. Once we focus on her duties to Slavik and Wall, we arrive again at the provisions of the VAA. The trial court correctly granted summary judgment on the negligent permission claim.

### 4. Hypnosis and/or dissociative testimony

In her notice of review, House contends the trial court abused its discretion when it allowed Slavik and Wall to testify to incidents that they allegedly had recalled for the first time under hypnosis. The testimony that Slavik and Wall presented served as evidence of the sexual abuse that Dr. Routt committed while the women had dissociated during therapy. Each woman testified through her alters to the abuse that had occurred to the alters either while Slavik and Wall were under hypnosis or while they were dissociating without being under hypnosis.

The issue of admissibility of testimony first procured during hypnosis or dissociation when the alleged abuse itself took place during hypnosis or dissociation is a question of first impression in Minnesota.

 Generally, a witness's testimony about a memory he or she recalled for the first time under hypnosis is not admissible for its truth. *State v. Mack,* 292 N.W.2d 764, 772 (Minn.1980); *State v. Grimmett,* 459 N.W.2d 515, 517 (Minn.App.1990). This rule arose when police took victims of sexual assault to hypnotists to work through their memory blocks about the incidents and reconstruct what had occurred. *Mack,* 292 N.W.2d at 767; *Grimmett,* 459 N.W.2d at 516. The *Mack* court referred to the *Frye* rule, which ordinarily requires that scientific tests must be sufficiently established to have gained acceptance in the field before their results are admissible at trial, when analyzing the admissibility of hypnotic testimony. *Id.* at 767–68. This rule does not preclude the admission of evidence unequivocally disclosed before the hypnosis occurred. *State v. Koehler,* 312 N.W.2d 108, 110 (Minn.1981).

Both Wall and Slavik first reported the abuse by Dr. Routt while in dissociative states during therapy sessions after Dr. Routt's death. Their treating counselors and therapists testified that they had not hypnotized the women during those sessions; while discussing their concerns, the women dissociated and began to reveal the secret abuse that had occurred. House alleges that Slavik and Wall were and are in some form of hypnotic state each time they dissociate. Consequently, she contends the testimony regarding their first reports of abuse, and all further accounts of the abuse that they rendered while dissociating, are unreliable and inadmissible under *Mack.*

House's arguments beg the question: does dissociation only occur in the hypnotic state? In other words, if a patient is able to shift into alter personalities involuntarily or voluntarily upon request, as occurred here on the witness stand, is she then in a hypnotic state even though no formal hypnosis has occurred?[3]

either party is entitled to a judgment as a matter of law.
Minn. R. Civ. P. 56.03. Minn. R. Civ. P. 54.02 does not speak to the scope of review on appeal, but rather empowers the trial court with authority to modify any order prior to entry of final

judgment in a case. Rule 54.02 is inapplicable here.

**3.** House argues that the trial court erred by failing to define "hypnosis" for the jury. The evidence presented at trial, both via testimony and

While no Minnesota case has addressed this issue, a case nearly on all fours with this case arose in the state of Georgia. *Dorsey v. State,* 206 Ga.App. 709, 426 S.E.2d 224 (1992), *cert. denied,* (Ga. Jan. 15, 1993). There, a teenage girl sought help from a female school counselor to address a multiple personality disorder that had developed after a history of intrafamilial childhood sexual abuse. *Id.* 426 S.E.2d at 225–26. The girl began spending increasingly more time in counseling and began working as a nanny for the counselor's children at home. Eventually, the girl moved in with the counselor and her family, where she resided for five years. *Id.* at 226. At a time when the girl began doubting whether her living arrangement was helping her condition, she went into a dissociative state while with a friend. While in this dissociative state, one of her alters revealed that she had been having sexual relations with the counselor and the counselor's husband. *Id.* During subsequent sessions with a psychologist and psychiatrist, the alters revealed that she had been a victim of sexual abuse at the hands of the counselor and her husband, individually and together. *Id.*

At trial, the court allowed the victim to testify in a dissociative state, over the objection of the defendants. *Id.* Like House did here, the defendants challenged the reliability of her testimony, arguing that the dissociative state is equivalent to a hypnotic trance and, since hypnotic testimony is unreliable and inadmissible, dissociative testimony ought to receive the same treatment. *Id.* at 227. In ruling the testimony admissible, the appellate court reasoned:

> The most important difference for our purposes is that hypnosis is a process a person voluntarily chooses to engage in yet which is externally imposed, while a dissociative state is involuntary and, although triggered by external stimuli, comes solely from within. We believe the non-volitional nature of a dissociative state itself makes statements made while in such a state

inherently more reliable than statements made in a hypnotic trance. Moreover, unlike the statements made in the hypnosis and truth serum cases, * * * in both of these trials the victim's testimony in a dissociative state could be tested for reliability.

*Id.* The court then stated that, because the goal of a trial is to ascertain the truth, any evidence that logically tends to prove or disprove an issue of the case is presumptively admissible. *Id.* Deferring to the discretion of the trial court to make evidentiary rulings, the Georgia appellate court ruled the dissociative testimony admissible. *Id.*

▬▬ We consider the *Dorsey* court's reasoning compelling and adopt it here. Slavik's and Wall's first reports of the abuse were reliable because they occurred while they were dissociating during therapy. They were not hypnotized at the time. The fact that the victims revealed the abuse involuntarily while in a dissociative state contrasts this case with *Mack* and makes the victims' initial statements more reliable than statements made under the voluntary state of hypnosis. Further, because the victims underwent direct- and cross-examination in a dissociative state, their testimony and credibility were tested for reliability in the presence of the jury. The trial court properly determined that the testimony regarding the first reports of abuse and the in-court dissociative testimony were reliable.

In addition to the reliability of the testimony, the testimony of the alter personalities in this case and in *Dorsey* is the only evidence available on the sexual abuse. This difference from the *Mack/Grimmett* line of cases is key. By the very nature of the abuse, Dr. Routt concealed his conduct from Slavik and Wall by calling forth their alters, either with the assistance of hypnosis or without. He then abused them and swore them to secrecy. If we applied the *Mack* rule to this type of case, we would be excluding from trial the

documentary evidence from the psychiatric field, suggests that the exact parameters and definition of hypnosis are unsettled and the topic of great

theoretical discussion. The jury had all of that evidence before it when determining this case.

only evidence of abuse.[4] If we excluded their dissociative testimony, we would be allowing the victims' mental state and vulnerability that led to the sexual abuse to become the shield of protection for the offender. No Minnesota law suggests that we are to take the *Mack* rule to that extreme.

 The trial court here allowed Slavik and Wall to testify in their altered states because he found the women "sufficiently competent" to testify. We agree. The alters are part of the women's personalities; all the concerns about witness competence and credibility were valid issues for the jury to consider when weighing the victims' testimony. *See Shastid v. Shue*, 247 Minn. 314, 326, 77 N.W.2d 273, 281 (1956) (questions of witness credibility and weight to be given to their testimony rest solely with jury). The competency and credibility of testimony was tested by the opportunity of House and the estate of Dr. Routt to cross-examine the women and their alters. *See id.* at 329, 77 N.W.2d at 283 (jury has duty and prerogative to determine conflicts in evidence and witness credibility). Essentially, the trial court reasoned that the women were not hypnotized when in an altered state but, as a further safeguard against improper use of their testimony, the court gave the *Mack* instruction to the jury, instructing them to disregard any testimony relating to events first recalled in a hypnotic state. These decisions were correct. We trust that the jury, after observing this lengthy trial and receiving proper legal instructions, was capable of performing its primary function of determining the credibility of Slavik, Wall, and their alter personalities. The trial court did not abuse its discretion when it allowed Slavik and Wall to testify in dissociative states.

## 5. Costs and Disbursements

Slavik and Wall allege the trial court abused its discretion when it awarded House costs to cover her use of the computerized documentary retrieval system called Trial-Link. Minn.Stat. § 549.04 (1996) governs the taxation of costs and disbursements and provides:

> In every action in a district court, the prevailing party * * * shall be allowed reasonable disbursements paid or incurred, including fees and mileage paid for service of process by the sheriff or by a private person.

Given our decision to reverse in part and remand for trial, we will not address the issue of costs and disbursements. Trial is not yet completed and no one is yet the "prevailing party." *Id.*

## DECISION

This case is not moot. The trial court erred when it directed a verdict in favor of House on the VAA claim and the negligent infliction of emotional distress claim because Slavik and Wall raised fact issues for the jury. Furthermore, the trial court erred when it evaluated the evidence and weighed witness credibility when directing the verdict. The trial court did not err when it directed a verdict for House on the intentional infliction of emotional distress claim, determined that the negligence and malpractice claims were subsumed into the VAA claim, and granted summary judgment on the negligent permission claim.

The court did not abuse its discretion when it allowed Slavik and Wall to testify in their dissociative states and admitted other evidence they related while dissociating in therapy.

**Affirmed in part, reversed in part, and remanded.**

---

The trial court was wise not to attempt to define a term that is the subject of such debate.

4. We do not address the question of whether an alter ego who has no independent recollection of the abuse can testify.