**DALCO CORPORATION, Appellant,**

v.

**Maurice DIXON and Brissman-Kennedy, Inc., Respondents.**

No. C1–82–1520.

Supreme Court of Minnesota.

Sept. 23, 1983.

Jerome S. Rice Law Offices, Minneapolis, for appellant.

O'Neill, Burke & O'Neill, St. Paul, for respondents.

KELLEY, Justice.

Appellant, Dalco Corporation (Dalco), instituted this action against a former employee, respondent Maurice Dixon, and against Dixon's subsequent employer, respondent Brissman-Kennedy, Inc. (B–K), alleging that Dixon breached a non-compete employment agreement; that both respondents are unfairly competing with Dalco; that B–K has tortiously interfered with Dalco's employment contract with Dixon and other contractual rights; and that as a result of all the foregoing, respondent B–K has illegally obtained an unfair competitive advantage over Dalco. Appellant sought both injunctive relief and damages. In three separate pretrial orders, the trial court (1) in the first order denied Dalco's motion for a temporary injunction, denied Dixon's motion for summary judgment and granted B–K's motion for summary judgment; (2) in the second order granted Dalco's motion for entry of judgment, thereby making the first order appealable; and (3) in the third order ordered Dalco to pay B–K $9,000 in attorney fees B–K incurred in defending the action. Dalco appeals from all three orders. We affirm in part and reverse in part.

Dalco and B–K are competitors in the sale of cleaning and janitorial supplies. Dixon commenced working for Dalco in 1959. After a 3-year lapse from 1964 to 1967, Dixon returned to employment at Dalco and was thereafter continuously employed until the fall of 1981. Up until July of 1981, Dixon was executive vice president and sales manager. The day following his resignation from Dalco, Dixon began working for Professional Building Supply Company, a Minneapolis cleaning products distributor, as vice president of sales. He left this position approximately 6 weeks later to enter employment with B–K.

Dixon denies that he ever signed or promised to sign a non-compete agreement during the course of his employment with Dalco. He was asked to sign one in July of 1981, 2 or 3 months before he resigned, but he refused to do so on advice of counsel. On the other hand, Dalco's president asserts Dixon did sign a non-compete agreement when he first commenced working for Dalco in approximately 1959; however, Dalco had been unable to locate it for production at the hearing. Dalco's president further claimed that sometime after Dixon returned to Dalco in 1967, Dixon had agreed to sign another modified non-compete agreement then, and now, being used by Dalco. All of Dalco's sales personnel had to execute such modified non-compete agreements, and part of Dixon's duties as vice president of sales for Dalco was to insure that the non-compete agreements were executed by the sales personnel. However, Dalco was unable to produce any non-compete agreement containing Dixon's signature.

Dalco seeks to enforce the alleged non-compete agreement against Dixon; claims that B–K interfered with its contract with Dixon and with contract rights it had with others; and contends that Dixon's knowledge of Dalco's pricing policies and the use of that knowledge on behalf of B–K constitutes unfair competition giving B–K—one of Dalco's chief competitors—an unfair competitive advantage. In support of its claim against B–K, Dalco submitted affidavits of some of its sales personnel which alleged with respect to sales accounts served by them that Dixon had knowledge of Dalco's pricing information and that B–K was engaging in price competition with Dalco in such a manner as to indicate that B–K must be using the confidential price and sales information obtained by Dixon from Dalco.

1. Following the hearing by the trial judge on Dalco's motion for a temporary injunction and the respondents' motion for summary judgment, Dalco attempted to submit a deposition of Thomas Fischer, a former B–K vice president, who raised some questions as to the propriety of B–K's hiring of Dixon away from Dalco and as to

whether B–K or Dixon engaged in unfair competition through suppressing information. Dalco likewise sought to present three affidavits raising a question of fact regarding B–K's alleged piracy of Dalco employees and the alleged improper use of confidential pricing information. The trial court refused to consider the deposition and the affidavits. Dalco contends that the trial court should have permitted further discovery between the date of the hearing and the date of the ruling, and that had the court done so, the deposition and affidavits should have been considered by the court in ruling on B–K's summary judgment motion.

We have previously held that in order to successfully oppose a motion for summary judgment a party may not rely on general statements of fact but rather "must demonstrate at the time the motion is made that specific facts are in existence which create a genuine issue for trial." *Erickson v. General United Life Insurance Co.*, 256 N.W.2d 255, 259 (Minn.1977). Moreover, Rule 3.02(c) of the Rules of Court for the Fourth Judicial District provides: "The Court will not consider any memoranda, documentation or letters submitted after the hearing unless an extended date is allowed by the court at the hearing." Because the trial judge had not explicitly granted Dalco an extension to complete discovery or file additional documents, the court was precluded by our decisions and by its own procedural rules from considering the submitted affidavits and deposition.

Dalco contends that since the trial court had not made its order granting summary judgment final by making the express determination that there was no just reason for delay in the entry of judgment under Minn.R.Civ.P. 54.02, the record remained open even after the hearing had been held. If we were to adopt Dalco's theory, a ruling on a pretrial summary judgment motion not made appealable by express determination under Rule 54.02 would be subject to continued changes throughout the course of litigation as new evidence was discovered and submitted. In our view, such a result

undermines the expediency which makes summary judgment a useful procedural practice. Accordingly, we affirm the trial court's ruling declining to consider the proffered documents.

2. The trial court denied Dalco's motion for a temporary injunction because it felt it unlikely that Dalco would prevail on the merits and because Dalco had failed to demonstrate it would suffer irreparable harm if the injunction was denied. An examination of the record sustains the trial court's denial of the temporary injunction. There did exist considerable doubt whether Dalco would prevail on the merits, and even if it did, it is clear it had an adequate remedy at law for damages.

3. A more troublesome issue arises from the trial court's granting of B–K's motion for summary judgment, while at the same time denying Dixon's motion for summary judgment. Had the trial court based its refusal to grant summary judgment in Dixon's favor on the grounds that the contrasting testimony of Dalco's president and that of Dixon created a genuine dispute as to whether and when Dixon may have entered into or agreed to enter into a non-compete agreement, Dixon should not have been granted summary judgment. But the court's memorandum attached to the July 26, 1982 order makes it clear that such was not the basis for denying Dixon's motion for summary judgment. After analyzing the criteria by which employment restrictive covenants are to be judged as set forth in *Bennett v. Storz Broadcasting Co.*, 270 Minn. 525, 134 N.W.2d 892 (1965), and applying the criteria to the facts of this case, the trial court stated:

[I]t is clear that the restrictions are invalid. There is nothing unique about the products sold by plaintiff or defendants. Dalco claims Dixon had knowledge of its pricing policies, but in this type of business, with 10,000 separate items, it is unlikely that this knowledge would be useful in a competitive market for any length of time. Dixon was a salesman for some time prior to leaving Dalco, and was employed elsewhere for two months

before joining Brissman-Kennedy, so his knowledge of pricing was not current.

This covenant serves primarily to prevent the employee from working for others or for himself in the same competitive field, and does not protect any legitimate interest of Dalco.

Therefore, we conclude that the trial judge's refusal to grant Dixon summary judgment was not based upon the factual dispute between the testimony of Dalco's president and Dixon as to whether there were restrictive covenants. Even if Dalco's position on the issue of the existence or non-existence of the restrictive covenant could be sustained, the trial court ruled they were "clearly invalid."[1]

It then follows that denial of Dixon's motion for summary judgment must be based on claims made against both Dixon and B–K in paragraph 6 of Dalco's complaint. The trial court stated in its memo that there were "no affidavits corroborative of the allegations [of paragraph 6 of the complaint] and no testimony was taken which raised questions of fact." In paragraph 6 of the complaint, Dalco alleged a conspiracy to engage in a vigorous campaign to unfairly compete and interfere with contractual relations of Dalco. We fail to perceive why the trial court was "unable to find that no genuine issue of fact exists for trial" with respect to those claims against Dixon but was able to find with respect to the same claims against B–K the absence of any genuine issue of fact. A claim for unfair competition and unlawful use of confidential information is properly brought against both the former employee and his current employer. *See, e.g., Alside, Inc. v. Larson,* 300 Minn. 285, 220 N.W.2d 274 (1974); *Sanitary Farm Dairies, Inc. v. Wolf,* 261 Minn. 166, 112 N.W.2d 42 (1961). In our view, the affidavits of Panzer, Gabbert, Kennedy, Sims and Peterson tend to support the allegations against both respondents in paragraph 6 of the complaint. While the trial court's observation that Dalco "is unlikely to prevail on the merits" against Dixon may be true and may be an equally appropriate observation with respect to Dalco's claim against B–K, all doubts as to the existence of a genuine issue of material fact must be resolved against the party moving for summary judgment—here, B–K. *Anderson v. Twin City Rapid Transit Co.,* 250 Minn. 167, 186, 84 N.W.2d 593, 605 (1957). Applying that standard, we hold the trial court erred in granting B–K summary judgment.

4. Since we hold that the trial court erred in granting B–K's motion for summary judgment, it is unnecessary to determine whether the trial court erred in granting B–K an award of attorney fees for Dalco's alleged bad faith in prosecuting this action. When a party prevails, even in part, the claim of bad faith in litigation must fail. *Northwestern National Bank of Minneapolis v. Shuster,* 307 N.W.2d 767, 772 (Minn.1981).

We affirm the trial court's ruling on excluding depositions and affidavits presented after the hearing on the summary judgment motions, the trial court's order refusing to grant Dalco a temporary injunction, and its order denying Dixon summary judgment. We reverse its order granting B–K's motion for summary judgment and its order awarding B–K attorney fees. We remand this case for trial on the remaining issues.

Affirmed in part, reversed in part and remanded.

---

1. The trial court, of course, did not have the benefit of our recent case of *Freeman v. Duluth Clinic, Ltd.,* 334 N.W.2d 626 (Minn.1983). Under the ruling of that case, if Dixon promised to sign a non-compete agreement a few months prior to his resignation, it is doubtful whether the promise would be enforceable because of lack of consideration.