**Ruth Kay WALL and Sandra Slavik, petitioners, Respondents,**

v.

**FAIRVIEW HOSPITAL AND HEALTHCARE SERVICES, d/b/a Fairview–Riverside Medical Center, et al., Defendants,**

**Kathy House, R.N., petitioner, Appellant.**

Nos. CX–96–1137, C1–96–1138.

Supreme Court of Minnesota.

Aug. 27, 1998.

Rehearing Denied Oct. 9, 1998.

Kay Nord Hunt, Phillip A. Cole, Lommen, Nelson, Cole & Stageberg, P.A., Minneapolis, for appellant.

Sheila Engelmeier, Thomas E. Marshall, Nancy A. Newark, Mackall, Crounse & Moore, PLC, Minneapolis, respondents.

## OPINION

PAUL H. ANDERSON, Justice.

Respondents Sandra Slavik and Ruth Kay Wall suffer from multiple personality disorder, now known as dissociative identity disorder (DID). Slavik and Wall sued and won judgments against their psychiatrist, Dr. William Routt, for violations of the Vulnerable Adults Act (VAA), Minn.Stat. § 626.557 (1994), sexual exploitation, professional malpractice, battery, and intentional and negligent infliction of emotional distress. They also sued Routt's psychiatric nurse, appellant Kathy House, for malpractice, negligent permission, and failure to report Routt's abuse under the VAA, which requires that licensed health care professionals report abuse of a vulnerable adult when they know or have reasonable cause to believe that abuse has occurred or is occurring. Subd. 3. Wall sued House for negligent and intentional infliction of emotional distress as well. The district court granted a directed verdict in favor of House on all claims, but the Minnesota Court of Appeals reversed as to the VAA and negligent infliction of emotional distress claims and remanded for a new trial.

House appeals the reversal of the directed verdict. In addition, she asserts that the case became moot before the court of appeals issued its decision because Slavik and Wall recorded satisfactions of judgment against Routt's estate that purportedly served to release all claims against her. House also appeals several of the district court's evidentiary rulings and its failure to issue a requested jury instruction. In a cross-appeal, Slavik and Wall challenge the district court's decision not to permit their independent malpractice claims against House to proceed to trial, arguing that the VAA does not subsume their malpractice claims. We conclude that (1) Slavik's and Wall's claims against House are not moot; (2) the malpractice claims and the VAA claims were identical claims; and (3) the district court properly directed a verdict in favor of House. Accordingly, we reinstate the district court's decision, affirming in part and reversing in part the court of appeals' decision.

The primary issue on appeal is the appropriateness of the directed verdict in favor of House. Therefore we begin with a thorough discussion of the record. The diagnostic manual used by mental health professionals, the DSM–IV, states that the essential feature of DID, the disorder that both Slavik and Wall suffer from, is "the presence of two or more distinct identities or personality states * * * that recurrently take control of behavior." [1] American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 484 (4th ed.1994) (hereinafter DSM.IV). Both Slavik and Wall dissociate and manifest alternative identities, commonly known as alters. Slavik calls herself "Mary," and her alters include "Grandma," "Anne," "Elizabeth," "Kate," and "Amelia." Wall's alters include "Tootie Kay," "Kay," "Michael," "Daniel," "the Silent One," "the Destroyer," and "the Little Girls." When the women were dissociating, an alter spoke; conversely, when the alters spoke, the women were dissociating. Slavik and Wall have extensive histories of trauma, including sexual, physical, and emotional abuse. Both women have been through intensive psychiatric and mental health treatment for DID, as well as for post-traumatic stress disorder, depression, recurrent suicide attempts, and episodes of self-mutilation.

Routt began treating Slavik and Wall in 1988 and served as their psychiatrist until he committed suicide in June 1991. Routt had staff privileges at Fairview–Riverside Medical Center in Minneapolis and placed Slavik and Wall there when they needed to be hospitalized for psychiatric care. In addition to treating patients hospitalized at Fairview–Riverside, Routt held a medication clinic at his office once a week, during which he assessed his patients and adjusted their medications. Slavik and Wall visited Routt's office for appointments to manage their medications, and both women underwent psychotherapy with Routt as well as with other psychotherapists. Slavik had five office visits in 1990 and five in 1991. Wall had one office visit in 1988, three in 1989, one in 1990, and nine in 1991.

House worked as Routt's sole nurse and assistant for six years, beginning in 1985 and ending with Routt's death in 1991. When Routt saw his hospitalized patients, House went on rounds with him and attended treatment team meetings with him and hospital staff. She also acted as the liaison between Routt and his patients' outpatient psychotherapists. In Routt's office, House typically met with each patient for 20 minutes during each visit and did an assessment. Routt then joined House and the patient to review House's assessment and to adjust the patient's medications if necessary.

1. "Dissociative Identity Disorder reflects a failure to integrate various aspects of identity, memory, and consciousness. Each personality state may be experienced as if it has a distinct personal history, self-image, and identity, including a separate name. * * * Particular identities may emerge in specific circumstances and may differ in reported age and gender, vocabulary, general knowledge, or predominant affect. * * *

"Individuals with this disorder experience frequent gaps in memory for personal history, both remote and recent. The amnesia is frequently asymmetrical. The more passive identities tend to have more constricted memories, whereas the more hostile, controlling, or 'protector' identities have more complete memories."

American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 484 (4th ed.1994).

Several of Slavik's and Wall's alters testified at trial that Routt drank alcohol during appointments and offered them alcohol as well. The receptionist who worked for Routt during 1991 stated that Routt's office sometimes smelled like alcohol, although she never saw Routt drinking. In addition, House testified that Routt told her that a staff person at Fairview–Riverside reported Routt to the Impaired Physicians Committee, alleging that he had slurred speech and was disoriented when the staff person called him at home at 3:00 a.m. Routt responded to these allegations by stating that he had been taking medication for bronchitis that made him disoriented. Despite knowing about these allegations, House repeatedly testified that she never personally knew that Routt drank while on the job.

During the time that Routt treated Slavik and Wall, both women also received intensive psychotherapy with other psychotherapists. Both Slavik and Wall reported to their psychotherapists that they had positive relationships with Routt. Neither woman reported to House that Routt was abusing or had abused them. However, the women did report incidents of abuse by people other than Routt.

Both Slavik and Wall testified about personal information that Routt had told them about himself, including information about his daughter's suicide, his own experience of abuse as a child, and other personal problems he struggled with. An expert explained at trial that mental health professionals generally consider such confidences to be serious boundary violations and agreed that this behavior was inappropriate. Wall admitted that House was never present when Routt told her about his personal life and that she never told House about any of these discussions. Slavik also testified that she never told House about the things Routt confided in her. Slavik testified that only once was House present when Routt behaved unusually with Slavik. This occurred during the last time Slavik met with Routt, during which Routt looked "extremely awful, [and] scared." Slavik asked House what was wrong with Routt, but House did not respond. In contrast to Slavik's and Wall's testimony, House stated that she never overheard Routt discussing his own problems with any of his patients.

After Routt's death, Slavik and Wall revealed that Routt had sexually abused them. In both cases, an alter first reported the abuse. Slavik was an inpatient at a treatment center for dissociative disorders in Colorado during the fall of 1991 when her alter "Ann" told a counselor that Routt had sexually abused her. At trial, "Ann" testified that Routt had sexual intercourse with her between 10 and 20 times, with most of the incidents occurring while Slavik was an inpatient at Fairview–Riverside. Slavik herself does not remember the abuse, and she admitted that she and her alters never told House about Routt's abuse. Another alter, "Elizabeth," testified that House was not present when Routt had sex with Slavik.

The first record of Wall reporting Routt's abuse was in March 1992, while she was hospitalized at Fairview–Riverside. During a dissociative episode, one of Wall's alters told a hospital staff member that Routt abused her. Wall herself was unaware that Routt had abused her, and she testified that her alters have not told her exactly what Routt did to her. Wall's alter "Kay" testified at trial that she had sexual intercourse with Routt while she was hospitalized at Fairview–Riverside, but "Kay" did not know when this hospitalization occurred. Wall's alter "Michael" testified about having once talked to House, but did not know the content of the conversation.

In April 1993, Slavik and Wall commenced separate actions against the personal representative of Routt's estate, Fairview–Riverside, and House. Both asserted claims against House for violation of the VAA, malpractice, and negligent permission. Wall's complaint also included claims against House for negligent and intentional infliction of emotional distress.

House and Fairview–Riverside brought motions for summary judgment. In opposition to House's motion, Slavik and Wall submitted an affidavit by Erica Miles, a former patient of Routt who claimed that House was aware of a sexual relationship between Routt and Miles as well as other boundary viola-

tions Routt committed with Miles. In her affidavit, Miles stated that House was present when Routt invited Miles to live with him, hugged and kissed her, discussed with her his unhappy marriage and having been sexually abused as a child, drank alcohol, used cocaine with her, and told her that she needed to have sex with a number of different people to get over her issues of sexual abuse.

The district court granted summary judgment on all of the claims against Fairview–Riverside. The court also granted summary judgment on the claim for negligent permission against House, but denied summary judgment on the claim for House's violation of the VAA. The court concluded that the allegations in Miles' affidavit raised genuine issues of material fact about House's knowledge of Routt's misconduct with another patient. Assuming that House knew about Routt's misconduct with Miles, the court concluded that it would be reasonable for House to suspect that Routt may have committed misconduct with other vulnerable patients as well. As to the malpractice claim, the court held that Slavik and Wall had failed to present expert testimony of a standard of care other than the VAA's reporting requirement. The court concluded that in the absence of evidence of an independent standard of care for the malpractice claim, Slavik's and Wall's claims against House for malpractice and violation of the VAA were "in effect, one and the same." The court consequently subsumed the malpractice claims into the VAA claims.[2] The district court denied House's motion for summary judgment on Wall's claims for negligent and intentional infliction of emotional distress.

Before testimony in the trial began, House moved to exclude all testimony from Slavik and Wall on matters that first came to light while they were dissociating. House based her motion on this court's decision in *State v. Mack*, which held that under the circumstances of that case, testimony about information that was first adduced during hypnosis is inadmissible in a criminal proceeding.

292 N.W.2d 764, 772 (Minn.1980). House argued that *Mack*'s prohibition on testimony about issues that first came to light under hypnosis applied equally to dissociative episodes. The district court agreed that *Mack* barred testimony in a civil trial on issues that first came to light under hypnosis, but concluded that whether Slavik or Wall had in fact related matters for the first time under hypnosis—whether dissociation was a form of hypnosis—was a disputed fact issue. House also sought to bar all testimony by Slavik and Wall while they were in a dissociative state, that is, testimony by their alters, contending that testimony during dissociation was not competent. The court denied the motion, concluding that Slavik and Wall were competent to testify even while dissociating.

Trial began in June 1995 and concluded almost three months later. Slavik and Wall presented extensive testimony about Routt's abuse, House's failure to report the abuse, and the resulting emotional and physical harm. The evidence included extensive expert testimony about Slavik's and Wall's experience of DID and the nature of DID generally, as well as the testimony of Slavik's and Wall's treating psychotherapists and psychiatrists. The two women and several of their alters each testified and were cross-examined about their knowledge of Routt's sexual abuse and other boundary violations.

Several witnesses presented critical testimony supporting the claims against House for failure to report Routt's abuse. Miles, whose affidavit was the basis for the court's denial of summary judgment on the VAA claims against House, testified about her relationship with Routt and House's knowledge of that relationship. Miles testified that House knew Miles and Routt went out for ice cream together because House asked Miles if she had enjoyed the ice cream; Routt told Miles in front of House that he had a drinking problem; Routt told Miles in front of House about his daughter's suicide and his problems with his wife; and House saw Routt cry in front of Miles. Contrary to the

---

**2.** Slavik and Wall immediately appealed the district court's grant of summary judgment to Fairview–Riverside. The court of appeals affirmed the district court. *Wall v. Fairview Hosp. and*

*Healthcare Servs.*, Nos. C6–95–153, C8–95–154, 1995 WL 450501 (Minn.App., Aug. 1, 1995), *pet. for rev. denied* (Minn., Sept. 28, 1995).

statement in her affidavit, however, at trial Miles denied that House had ever witnessed any sexual intercourse between Miles and Routt. But Miles testified that she saw House take a prescription pad out of a drawer in Routt's desk once when the drawer contained a vial of cocaine. She admitted on cross-examination, however, that the assertion in her affidavit stating that House saw Routt and Miles use cocaine together was incorrect.

James Konkler, a patient of Routt, claimed that during treatment sessions Routt smelled like alcohol and his speech was slurred. Konkler also testified that House was always present when he met with Routt. Carl Terwilliger, who worked at Fairview–Riverside, stated that he once had to help Routt find his way through the hospital because Routt appeared disoriented and hung over.

At the close of Slavik's and Wall's case, House moved for a directed verdict on all of the remaining claims against her, including their claims for failure to report abuse under the VAA and Wall's claims for negligent and intentional infliction of emotional distress. The district court granted House's motion in its entirety. The court also granted a directed verdict as to the claims for punitive damages against House, but this issue is not on appeal.

The district court found no evidence that House had actual knowledge of any abuse. Based on this finding, the court framed the VAA claim in terms of whether House had reasonable cause to know that abuse had occurred or was occurring. The court then reviewed the evidence presented that suggested that House had reasonable cause to believe Slavik and Wall were being abused. Taking as true Miles' testimony that House witnessed numerous boundary violations during Routt's treatment of Miles, the court determined that such information would alert House that Routt was a potential abuser, but would not by itself provide reasonable cause for House to know that Routt abused either Slavik or Wall. To hold otherwise, the court reasoned, would require that once the abuse of any patient occurred, a health care worker would be statutorily required to make a report of suspected abuse of every subsequent patient, regardless of whether she had any knowledge of abuse of that particular patient.

Nonetheless, the district court determined that because House had witnessed Routt's boundary violations with Miles, House would have required less information about Routt's relationship with Slavik and Wall to create reasonable cause to believe that Routt was abusing Slavik and Wall. The court then held that the only boundary violation with Slavik and Wall the court could reasonably infer that House might have known about was that Routt drank during business hours. The court concluded that Routt's drinking in front of Slavik and Wall, without more, did not constitute as a matter of law "repeated conduct which produces or could reasonably be expected to produce mental or emotional distress" under the VAA. *See* Minn.Stat. § 626.557, subd. 2. Accordingly, the court granted a directed verdict for House on the VAA claims. The court also granted House's motion for a directed verdict on Wall's claim for negligent and intentional infliction of emotional distress, concluding that Wall had not produced sufficient evidence to support the claims.

After the district court granted the directed verdict in favor of House, the trial continued with Slavik's and Wall's claims against Routt's estate. On these claims, the jury found that Routt violated the VAA, inflicted intentional and negligent emotional distress, and committed professional malpractice, battery, and sexual exploitation. In August 1996, the district court entered judgments against Routt's estate for Slavik in the amount of $2,433,591 and for Wall in the amount of $2,537,854.75. The following month, Slavik and Wall executed satisfactions of judgment and *Pierringer* releases against Routt's estate.

Slavik and Wall appealed the district court's grant of a directed verdict to House. The court of appeals affirmed in part, reversed in part, and remanded the case for a new trial against House on all claims except Wall's claim for intentional infliction of emotional distress. The court of appeals reached five conclusions that we are reviewing in this appeal: (1) the case was not moot despite the fact that Slavik and Wall had obtained satis-

factions of judgment against Routt's estate; (2) the district court erred in directing a verdict in favor of House on the VAA claims; (3) the district court likewise erred in directing a verdict in favor of House on Wall's claim for negligent infliction of emotional distress; (4) the district court correctly subsumed the malpractice claims into the VAA claims; and (5) the district court did not abuse its discretion in allowing Slavik and Wall to testify about information that they first revealed while in a dissociative state or in allowing them to testify while in a dissociative state.

## I.

### Mootness

■ As a threshold issue, we first address House's contention that her appeal was rendered moot before the court of appeals issued its decision. House bases her contention on the fact that Slavik and Wall executed satisfactions of judgment against Routt's estate, arguing that the satisfactions of judgment, executed while the case was pending before the court of appeals, satisfy *all* of Slavik's and Wall's claims, including those against House.

In September 1996, Slavik and Wall settled with Routt's estate and signed satisfactions of judgment for any amounts due them from the estate. The satisfactions specifically state that the satisfied judgments are against the representative of Routt's estate. At the same time, Slavik and Wall, as claimants against Routt's estate and his malpractice insurer, executed *Pierringer* releases that state:

> Claimant, Defendant and Insurer agree that this Release and Settlement Agreement is not a release of Claimant's claims against Kathy House, R.N. ("House"). Claimant intends to proceed with her appeal against House, which appeal is currently pending at the Minnesota Court of Appeals * * *. This *Pierringer* Release is not entered into, nor any way intended, to release any claim or cause of action by Claimant against House for damages sustained as a result of the occurrence described by Claimant in the Lawsuit, said

claims and causes of action being specifically preserved and retained against House.

The satisfactions of judgment were filed with the district court in October 1996. The *Pierringer* releases, however, were not filed with the district court until May 1997, after House raised the mootness issue in the court of appeals.

Both statute and case law contradict House's claim that execution of a satisfaction of judgment extinguishes all claims against all defendants. Minnesota Statutes section 548.15 governs judgments, providing that a judgment need not be entered against all defendants to be valid: "upon the satisfaction of a judgment, whether wholly or in part, or as to all or any of the several defendants, the court administrator shall enter the satisfaction in the judgment roll." Subd. 1 (1996). Moreover, more than 40 years ago, we held that partial satisfaction from one joint tortfeasor does not prevent recovery from another joint tortfeasor. *Gronquist v. Olson*, 242 Minn. 119, 128–29, 64 N.W.2d 159, 166 (1954). In *Gronquist v. Olson*, we stated that "regardless of what form the release may take, as long as it does not constitute an accord and satisfaction or an unqualified or absolute release, and there is no manifestation of any intention to the contrary in the agreement, the injured party should not be denied his right to pursue the remaining wrongdoers." *Id.* at 128, 64 N.W.2d at 165 (emphasis omitted). We reiterated in *Couillard v. Charles T. Miller Hosp., Inc.* that the intent of the parties to a release must be considered in determining whether the release discharges all of the claims against all of the defendants. 253 Minn. 418, 424, 92 N.W.2d 96, 100 (1958).

In the case before us here, the plain language of the satisfactions of judgment indicates that they apply only to Routt's estate. Moreover, Slavik's and Wall's intent to pursue their claims against House is manifestly clear in the *Pierringer* releases, executed the same day. The releases state explicitly that Slavik and Wall did not intend to release their claims against House. Under *Gronquist*, Slavik's and Wall's clear intent to retain and pursue claims against House means that the satisfactions do not release the

claims against her. To hold otherwise would also contradict our strong public policy of encouraging settlement. *See, e.g., Minneapolis Star & Tribune Co. v. Schumacher,* 392 N.W.2d 197, 205 (Minn.1986); *Johnson v. St. Paul Ins. Cos.,* 305 N.W.2d 571, 573 (Minn.1981). Accordingly, we hold that this appeal is not moot.

## II.

### Medical Malpractice Claims

Slavik and Wall appeal the lower courts' conclusions that their medical malpractice claims were essentially identical to their VAA claims. In ruling on House's motion for summary judgment, the district court held that because Slavik and Wall had presented no evidence of a standard of care beyond House's failure to report abuse under the VAA, neither of them had independent malpractice claims. The district court thus subsumed the malpractice claim into the VAA claim, in effect granting summary judgment on the malpractice issue. Slavik and Wall argue that their witnesses *at trial* testified about an independent standard of care breached by House and that we should consider such trial testimony sufficient to create an independent malpractice claim. Alternatively, they contend that there was sufficient expert testimony before the court on summary judgment to establish an independent standard of care and thus permit an independent malpractice claim to go forward.

■ Initially, we reject Slavik's and Wall's contention that we should consider the entire trial record and not merely the evidence before the district court at summary judgment. Summary judgment is designed to prevent unfounded claims from proceeding to trial. *See Lindgren v. Sparks,* 239 Minn. 222, 225, 58 N.W.2d 317, 319–20 (1953). In *Dalco Corp. v. Dixon,* we explicitly rejected a plaintiff's attempt to keep the record open and submit additional material in support of plaintiff's opposition to a motion for summary judgment after the summary judgment hearing took place but before the court issued a ruling. 338 N.W.2d 437, 439–40 (Minn.1983). If the record were to remain open after summary judgment, a ruling on a pretrial summary judgment motion would be subject to continued changes throughout the course of litigation as new evidence was discovered and submitted. To allow trial testimony to form the basis of a claim after the court has already ruled that the claim may not go forward would undermine the purpose of summary judgment, and we refuse to allow it here.

■ Having concluded that expert testimony presented at trial may not form the basis of an independent malpractice claim, we proceed to Slavik's and Wall's alternate contention that the record at the time of the summary judgment motion contained sufficient expert testimony regarding a separate standard of care that would have allowed an independent malpractice claim to go forward. Summary judgment is proper when the pleadings, depositions, interrogatory answers, admissions, and affidavits "show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. On review of a grant of summary judgment, we determine whether there are any genuine issues of material fact and whether the district court erred in its application of the law. *Betlach v. Wayzata Condominium,* 281 N.W.2d 328, 330 (Minn.1979).

■ In a medical malpractice case, the plaintiff is required to identify in affidavits all expert witnesses, the substance of the facts and opinions to which they will testify, and a summary of the grounds for the experts' opinions. Minn.Stat. § 145.682, subd. 4 (1996). This information must include specific details concerning the expert testimony, including the applicable standard of care, the defendant's acts or omissions that allegedly violated the standard of care, and an outline of the chain of causation between the alleged violation of the standard of care and the claimed damages. *Stroud v. Hennepin County Med. Ctr.,* 556 N.W.2d 552, 555–56 (Minn.1996); *Sorenson v. St. Paul Ramsey Med. Ctr.,* 457 N.W.2d 188, 192 (Minn.1990). Expert medical witnesses must have both sufficient scientific knowledge and practical experience with respect to the subject matter of the offered testimony. *Cornfeldt v. Tongen,* 262 N.W.2d 684, 692 (Minn.1977).

Slavik's answers to House's interrogatories listed as expert witnesses Dr. Gary Blackmore, a psychiatrist; John Gonsiorek, a psychologist; and Bette Hansen, Slavik's psychotherapist. Slavik states that Blackmore will testify that "House failed to protect patients from Routt when she knew or should have known of Routt's medical and psychological condition and inappropriate treatment." The substance of Gonsiorek's testimony is that House "failed to protect vulnerable adults like Sandra Slavik and Ruth Kay Wall; * * * failed to report Routt to the appropriate authorities; and * * * failed to warn patients like Sandra Slavik and Ruth Kay Wall." Hansen's testimony about House's breach of the standard of care is that House "knew or should have known about [Routt's] chemical (i.e. drug and alcohol) use, his medical condition, and his sexual behavior with patients. Her failure to confront Routt or inform the hospital administrators would be a breach of her ethics as a caregiver, at the very least."

■ As a matter of law, none of this expert testimony is sufficient to create an independent medical malpractice claim against House. As a psychiatrist, Blackmore is competent to testify about the appropriate standard of care for a psychiatric nurse. But the standard of care he articulates—that House failed to protect Slavik and Wall—is insufficient to establish any standard of care beyond the VAA's reporting requirement. Moreover, we have declined to impose a general duty on nurses to compel a physician to take additional treatment steps, a standard of care possibly contained in Blackmore's cursory statement. See Mercil v. Mathers, 517 N.W.2d 328, 328 (Minn.1994). We require that an expert's description of his or her testimony contain more than this type of broad, conclusory statement, and we fail to perceive here a separate standard of care on which a valid malpractice claim could proceed. See Stroud, 556 N.W.2d at 556; Sorenson, 457 N.W.2d at 192–93.

■ We need not consider the standards of care articulated by psychologist Gonsiorek and psychotherapist Hansen because we hold as a matter of law that they are not competent to testify about the appropriate standard of care for a psychiatric nurse. We have held that a psychologist's lack of practical experience with an antipsychotic medication precluded him from serving as an expert witness regarding a medical doctor's standard of care. Lundgren v. Eustermann, 370 N.W.2d 877, 879–81 (Minn.1985). Here, neither Gonsiorek nor Hansen has the requisite scientific background of medical training or the practical experience in supervising a psychiatric nurse. Therefore, they cannot serve as expert witnesses regarding the standard of care that House allegedly breached. See Cornfeldt, 262 N.W.2d at 692. Because Slavik and Wall failed to present any expert testimony establishing a separate standard of care, we affirm the court of appeals' holding that the district court correctly declined to allow Slavik and Wall to bring independent malpractice claims at trial.

### III.

#### VAA Claims

We next address the court of appeals' reversal of the district court's grant of a directed verdict for House on Slavik's and Wall's claims under the VAA. House contends that the court of appeals misconstrued the VAA to require a lesser standard of suspicion to trigger its reporting requirement and that the district court properly interpreted the VAA and applied it to the facts elicited at trial.

■ A district court may grant a motion for a directed verdict when, as a matter of law, the evidence is insufficient to present a question of fact to the jury. Zinnel v. Berghuis Constr. Co., 274 N.W.2d 495, 498 (Minn.1979). When deciding a motion for a directed verdict, the district court must treat as credible all evidence from the nonmoving party and all inferences that may be reasonably drawn from that evidence. Plutshack v. University of Minn. Hosps., 316 N.W.2d 1, 5 (Minn.1982). Nonetheless, when all of the evidence will sustain "two or more inconsistent inferences so that one inference does not reasonably preponderate over the others," the court must direct a verdict because the plaintiff has not sustained the burden of proof. E.H. Renner & Sons v. Primus, Inc.,

295 Minn. 240, 243, 203 N.W.2d 832, 835 (1973).

On review, an appellate court "must independently determine whether an issue of fact exists when the evidence is viewed in a light most favorable to the nonmoving party." *Baber v. Dill*, 531 N.W.2d 493, 495 (Minn. 1995). Our review of the directed verdict on the VAA claim requires us to address two distinct questions: first, did the district court properly interpret the VAA's standard for when a report of abuse is required; and second, under the proper standard, was there a legally sufficient question of fact to present to the jury?

The VAA creates a civil cause of action for negligent or intentional failure to report abuse of a vulnerable adult. Minn. Stat. § 626.557, subd. 7(b) (1994). At the time Routt abused Slavik and Wall, the VAA mandated that a licensed health care professional such as House "who has knowledge of the abuse or neglect of a vulnerable adult, [or] has *reasonable cause* to believe that a vulnerable adult is being or has been abused" immediately report the information. *Id.*, subd. 3 (emphasis added). The statute defines a vulnerable adult as any person age 18 or over who is an inpatient at a facility or "who, regardless of residence or type of service received, is unable or unlikely to report abuse * * * without assistance because of impairment of mental or physical function or emotional status." *Id.*, subd. 2(b)(1), (4). The relevant definitions of abuse include "nontherapeutic conduct which produces or could reasonably be expected to produce pain or injury and is not accidental, or any repeated conduct which produces or could reasonably be expected to produce mental or emotional distress" and "any sexual contact between a facility staff person and a resident or client of that facility." *Id.*, subd. 2(d)(2), (3).

We have not previously defined "reasonable cause" as used in the VAA. We have, however, interpreted "reasonable cause" to mean "probable cause" in a variety of criminal contexts. *See, e.g., State v. Childs*, 269 N.W.2d 25, 27 (Minn.1978) (interpreting the shoplifting arrest statute); *State v. Harris*, 265 Minn. 260, 263–64, 121 N.W.2d 327, 330 (1963) (holding that the constitutional standard of probable cause and the statutory standard of reasonable cause are synonymous). In *State v. Childs*, we defined reasonable or probable cause as a "reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty." 269 N.W.2d at 27 (quoting *State v. Sorenson*, 270 Minn. 186, 196, 134 N.W.2d 115, 122–23 (1965)).

Analogizing from this definition, reasonable cause requires grounds for belief beyond mere suspicion or foreseeability; mere suspicion or foreseeability must be supported by sufficiently strong circumstances. We thus conclude that the court of appeals erred in construing the VAA to require reporting based on suspicion alone. As the district court pointed out, the VAA's reporting requirement is particularized, extending to the abuse of individual vulnerable adults. *See* Minn.Stat. § 626.557, subd. 3. Therefore, the knowledge that gives rise to the reporting duty must be particularized or specific to each individual. Knowledge of abuse of a different individual, however, is a relevant factor for determining when there is reasonable cause to believe a vulnerable adult is being abused. In essence, knowledge of abuse of another person becomes a critical factor in reaching the reasonable cause threshold.

Having interpreted the VAA to require particularized or individualized reasonable cause, not mere suspicion or foreseeability, we next independently examine the facts elicited at trial to determine whether Slavik and Wall raised a sufficient question of fact to successfully deflect a motion for directed verdict and thus permit their claims to go to the jury. *See Baber*, 531 N.W.2d at 495. When conducting this examination, we interpret all of the facts in the light most favorable to Slavik and Wall. *Id.* We conclude initially, as did the district court, that there was no evidence that Slavik or Wall told House about Routt's abuse. Indeed, Slavik and Wall admitted that they never revealed Routt's abuse to House. We therefore must determine if there is other evidence showing

that House had reasonable cause to know about the abuse.

We must first determine precisely what information House had about Routt's abuse of other individuals. The only other person whom Routt allegedly abused is Erica Miles, and thus Miles' testimony is critical. Miles testified at trial only that House witnessed or knew about various boundary violations: Routt and Miles going out for ice cream; Routt telling Miles he had a drinking problem; Routt crying in front of Miles; and Routt telling Miles about his daughter's suicide and problems with his wife. Miles denied that House knew that she had sexual intercourse with Routt and testified that House knew only about Routt's hugging, kissing, and hand-holding. Thus, the record reflects only that House knew that Routt committed boundary violations in his treatment of Miles, but not that Routt sexually abused Miles.

Assuming here, as we must, the truth of Miles' testimony that House witnessed Routt's boundary violations with Miles, we hold that witnessing those boundary violations cannot on its own have provided reasonable cause for House to believe Routt had abused Slavik and Wall as well. If Miles' testimony alone created reasonable cause, House would have to make a report of suspected abuse for every one of Routt's patients. Such a result would contradict the particularized or individualized nature of the statute and lead to an unworkable result. Nonetheless, we recognize that House's knowledge of Routt's abuse of Miles should have been a factor in her reasonable cause determination regarding abuse of Slavik and Wall. As a consequence of that knowledge, House should have required less information, albeit specific information about Slavik and Wall, to have reasonable cause to believe that Routt was abusing Slavik and Wall.

We next turn to what information House had about Routt's conduct with Slavik and Wall, particularly that information which, combined with her knowledge about Miles, would have created reasonable cause. The district court concluded that seeing Wall crying in the corner would not give House reasonable cause to believe Slavik and Wall were being abused. We agree. First, because the VAA's reporting requirement is individualized, Wall's conduct during treatment with Routt reveals nothing about Routt's actions with Slavik. More importantly, the record reveals that Wall was deeply psychologically troubled and the fact that Wall expressed her distress by crying in the corner was not inconsistent with her illness. Nor would House have reasonable cause to believe Routt was abusing either Slavik or Wall because Routt had jaundiced eyes and appeared overworked and sad. No person, not even a psychiatric nurse, could reasonably infer that a psychiatrist was abusing his patients from the fact that he looked tired, ill, and distressed.

Slavik and Wall testified that Routt drank in front of them. Given that House had a close working relationship with Routt, we believe a valid inference arises that House knew or should have known that Routt drank at work. Nonetheless, we agree with the district court that drinking in front of patients is not abuse under the VAA because it could not, in and of itself, as a matter of law produce or reasonably be expected to produce mental or emotional distress. *See* Minn.Stat. § 626.557, subd. 2(d)(2). Therefore, we conclude that House did not violate the VAA's reporting requirement solely by failing to report that Routt drank in front of Slavik and Wall.

Distilling these relevant facts produced at trial and linking them together, we must decide whether House's knowledge of Routt's boundary violations with Miles, together with our determination that House knew or should have known that Routt drank at work, created reasonable cause for House to believe Routt abused Slavik and Wall. Following the district court's adept and thoughtful analysis, we conclude that because the VAA requires particularized or individualized information to create reasonable cause to believe a specific vulnerable adult has been or is being abused, the evidence at trial fails to raise a sufficient question of fact to go to the jury. The most House knew about Routt's conduct with Slavik and Wall was that he drank in front of them. House never saw Routt abuse Slavik or Wall. Slavik and Wall did not pres-

ent evidence that House knew or should have known about any of Routt's boundary violations with them, such as his statements to them about his daughter's suicide. There was no evidence that a third party told House about any boundary violations with Slavik and Wall. Without additional particularized or individualized information, the evidence Slavik and Wall presented at trial was insufficient to raise a fact question as to whether House had reasonable cause to believe that Routt abused them. We therefore reverse the court of appeals on this issue and reinstate the district court's directed verdict in favor of House on the VAA claims.

## IV.

### Negligent Infliction of Emotional Distress

The next issue we consider is the court of appeals' reversal of the district court's grant of a directed verdict on Wall's claim for negligent infliction of emotional distress. Wall's claim for negligent infliction of emotional distress rests on House's recurrent failure to prevent Routt's abuse, as well as a single incident when House failed to help Wall when informed that Wall's roommate, James Konkler, had a loaded gun and had threatened to commit suicide.

■ To establish a claim for negligent infliction of emotional distress, a plaintiff must show that she was within a zone of danger of physical impact, reasonably feared for her safety, and suffered severe emotional distress with accompanying physical manifestations. *Stadler v. Cross*, 295 N.W.2d 552, 553 (Minn.1980). The zone of danger is limited to actual physical danger caused by the defendant's negligence. *Langeland v. Farmers State Bank of Trimont*, 319 N.W.2d 26, 31 (Minn.1982). In other words, a plaintiff presents a valid claim when she experiences a reasonable anxiety, with physical symptoms, "from being in a situation where it was abundantly clear that plaintiff was in grave personal peril for some specifically defined period of time. Fortune smiled and the imminent calamity did not occur." *K.A.C. v. Benson*, 527 N.W.2d 553, 558 (Minn.1995). Due to concerns about unintended and unreasonable results, we have deliberately lim-

ited the zone of danger to the threat of personal physical danger. *Id.* at 559.

■ Wall's claim for negligent infliction of emotional distress does not fit the facts that emerged at trial. A plaintiff is in a zone of danger when physical harm might occur, but fortunately does not. Wall was not merely in a zone of danger with Routt—she was in fact physically harmed by his abuse. Furthermore, House could not have placed Wall in a zone of danger because she did not have reasonable cause to believe Routt abused Wall. Finally, House's alleged failure to prevent Wall from living in a potentially dangerous situation does not raise a valid claim for negligent infliction of emotional distress. Wall's own decisions regarding her living situation placed her in the zone of danger, if any, from her armed and suicidal roommate. We thus reverse the court of appeals on this issue and reinstate the district court's directed verdict in favor of House on Wall's claim for negligent infliction of emotional distress.

## V.

### Evidentiary Issues

■ Because we conclude that the district court correctly directed a verdict in favor of House, we need not review House's arguments that the district court erred in several of its evidentiary rulings and its denial of one of House's requested jury instructions, since those issues would be relevant only to a retrial. We nonetheless address the evidentiary questions because we wish to provide some direction as to how a district court should handle witnesses with DID and the testimony of their alters. House contends first that the court abused its discretion in concluding that Slavik and Wall were competent to testify while they were in a dissociative state, and second, that the court further abused its discretion in holding that it was a disputed question of fact whether Slavik and Wall had first related information about Routt's abuse while under hypnosis. We conclude that the court did not abuse its discretion regarding either of these determinations. In fact, after a thorough review of the voluminous transcript, we believe that

the court's handling of these potentially difficult witnesses was entirely appropriate.

■■■■■ Determining the competency of a witness to testify is within a district court's sound discretion. *State ex rel. Dugal v. Tahash*, 278 Minn. 175, 177, 153 N.W.2d 232, 234 (1967). Typically, the district court conducts a preliminary examination to determine whether the witness understands the obligation of the oath and can correctly narrate the facts to which her testimony relates. *State v. Amos*, 347 N.W.2d 498, 501 (Minn. 1984). As long as the witness understands the obligation to tell the truth and can recall and relate relevant events, the witness is competent and should be permitted to testify. *Dugal*, 278 Minn. at 178, 153 N.W.2d at 234–35.

Here, the district court decided that Slavik and Wall were competent to testify while in a dissociative state, and thus the court permitted their alters to testify. The court reasoned that no legal authority prohibited such testimony, Slavik and Wall were rational and articulate, and defense counsel had the opportunity to cross-examine each alter concerning her understanding of the requirement to give truthful testimony and willingness to do so. Although the court did not do a preliminary competency determination on each of the alters, Slavik's and Wall's counsel and defense counsel questioned the alters about their ability to tell the truth. Presumably, if one of the alters said something indicating that she or he might not be competent to testify, the defense would have made a specific objection and the court would have made a ruling on the objection. Yet the record is void of objections based on the competency of specific alters, even though some of the alters who testified were only three or four years old. We conclude that the court did not abuse its discretion and, under the facts of this case, its decision to allow Slavik's and Wall's alters to testify was entirely appropriate.

■■■■ The second evidentiary issue that House raises on appeal presents a more complex question: is dissociation a form of self-hypnosis or sufficiently similar to hypnosis so that our decision in *State v. Mack* bars Slavik's and Wall's testimony about any issues that were first related while they were in a dissociative state. We concluded in *State v. Mack* that, under the facts in that case, testimony about information that was first adduced during hypnosis is inadmissible in a criminal proceeding. 292 N.W.2d at 772. Here, the district court held that *State v. Mack* applies to testimony in civil suits, but concluded that this case presented two disputed fact issues for the jury: first, whether some form of hypnosis actually occurred when the women dissociated, and second, whether any particular memory was first recalled under some form of hypnosis.

In *Mack*, we discussed in detail the problems with testimony about a memory supposedly revived by hypnosis. Most problematic was the fact that "no expert can determine whether memory retrieved by hypnosis, or any part of that memory, is truth, falsehood, or confabulation—a filling of gaps with fantasy." *Id.* at 768. In addition, a hypnotized subject is highly susceptible to suggestion, even to subtle or unintended suggestion. *Id.* Finally, we noted that a memory produced under hypnosis becomes fixed in the subject's mind, so much so that "ordinary 'indicia of reliability' are completely erased." *Id.* at 769. We concluded that meaningful cross-examination of such a witness is impossible because the witness is subjectively convinced of the memory's truthfulness. *Id.* at 770.

The court of appeals concluded that hypnosis and dissociation are fundamentally different because the nonvolitional nature of dissociation makes the information revealed during dissociative states inherently more reliable than information revealed during hypnosis. Therefore, the court of appeals held that *State v. Mack* did not bar any testimony about issues that first came to light during a dissociative episode. To reach this conclusion, the court of appeals adopted the reasoning of *Dorsey v. State*, a Georgia Court of Appeals case with similar facts that analyzed the differences between hypnotic and dissociative testimony. 206 Ga.App. 709, 426 S.E.2d 224, 226–27 (1992).

In *Dorsey*, a woman's alter personality told her psychologist that she was being sexually abused by a high school guidance counselor.

426 S.E.2d at 226. The district court permitted the woman to testify at the guidance counselor's trial about the sexual abuse, which first came to light while she was dissociating. *Id.* The court also permitted the woman to testify while she was in a dissociative state, that is, to allow her alters to testify. *Id.* The Georgia Court of Appeals affirmed the district court based on its articulation of the supposed fundamental difference between hypnosis and dissociation:

> The most important difference for our purposes is that hypnosis is a process a person voluntarily chooses to engage in yet which is externally imposed, while a dissociative state is involuntary and, although triggered by external stimuli, comes solely from within. We believe the non-volitional nature of a dissociative state itself makes statements made while in such a state inherently more reliable than statements made in a hypnotic trance.

*Id.* at 227. The *Dorsey* court noted that questions about the inherent reliability of statements made under hypnosis did not arise in the case because the victim testified in a dissociative state and thus her statements' reliability could be tested on cross-examination and evaluated by the jury. *Id.*

We specifically reject our court of appeals' uncritical reliance on *Dorsey* and its holding that dissociation is fundamentally different from hypnosis when considering the reliability of witness testimony. The *Dorsey* court never explained why the nonvolitional nature of dissociation makes the resulting statements more reliable than statements articulated during hypnosis; its reasoning may be grounded in the uncontradicted expert testimony at trial that "the victim in a dissociative state would not lie." *Id.* Here, however, several of Slavik's and Wall's witnesses conceded that persons with DID can produce incomplete memories.

Moreover, the court of appeals failed to acknowledge that some of Slavik's and Wall's witnesses stated that dissociation may be related to self-hypnosis. One of Slavik's psychotherapists testified that many people with DID, including Slavik, engage in self-hypnosis and can induce a trance, a term she used interchangeably with hypnosis. This witness also described Slavik's presentation of alters at her therapist's request as involving hypnosis or trance. No witness stated that dissociation is fundamentally dissimilar from hypnosis for determining the reliability of witness testimony.

Finally, even if dissociation and hypnosis are not the same phenomena, many of the concerns we expressed in *Mack* about information elicited during hypnosis apply as well to statements produced during dissociation. Expert testimony revealed that persons with DID can be highly suggestible. To the extent that inaccurate information is "recalled" during dissociative episodes, the person's belief in the memory's validity is increased. The resulting inability to ferret out the truth through cross-examination about such memories is another of the concerns we articulated in *Mack* about hypnotically-recalled information. The court of appeals' reliance on Slavik's and Wall's testimony is misplaced if their testimony was based on inaccurate memories that they nonetheless unequivocally believed to be true.

We recognize, however, that there are compelling policy arguments against a per se rule that treats episodes of dissociation as equivalent to hypnosis. If testimony from a person in a dissociative state is never admissible, someone who is aware of the person's dissociative disorder could take advantage of that person with impunity. *See id.* at 711–12. Excluding dissociative testimony would allow the mental state that led to the sexual abuse to become the shield of protection for the abuser.

In addition, there is considerable controversy in the psychiatric and psychotherapeutic communities about the diagnosis of DID. Experts cannot agree whether the occurrence of dissociation and the emergence of alters are sometimes encouraged or even produced by psychotherapy, and whether the disorder is overdiagnosed by a small number of psychotherapists. *See* DSM–IV, at 486–87. Coming to a reasoned conclusion on this issue is particularly difficult because the mental health community has not yet reached a consensus on the nature of the disorder. *Id.* By allowing the jury to determine whether information had first emerged

under hypnosis and thus was not admissible, the district court recognized that conflicting testimony on this issue would be presented at trial. This procedure thus allowed the jury to determine which side of the debate it found more credible—whether DID is or is not a form of hypnosis.

Because our understanding of DID is in flux, we decline to hold that *Mack* prohibits all testimony about events that first came to light while a witness was dissociating. Instead, we believe that the district courts are in the best position to determine how to handle witnesses with DID and whether their testimony is admissible. Therefore, we conclude that the district court did not abuse its discretion in allowing the jury to determine whether dissociation is sufficiently similar to hypnosis and whether any memories of abuse were actually first recalled during dissociation. Here, the court used appropriate discretion in allowing Slavik and Wall to testify, and we urge other courts to heed this example and to proceed thoughtfully and cautiously when witnesses with DID appear in their courtroom.

In sum, we hold that this appeal did not become moot while pending before the court of appeals. We affirm the part of the court of appeals decision addressing Slavik's and Wall's malpractice claim. Finally, we reinstate the district court's grant of a directed verdict to House on all of Slavik's and Wall's claims against her.

Affirmed in part and reversed in part.

BLATZ, C.J., took no part in the consideration or decision of this case.

GILBERT, Justice (dissenting).

I respectfully dissent. I agree with all of the majority's conclusions except their narrow construction of the reporting standard of the Vulnerable Adults Act (VAA), Minn.Stat. § 626.557 (1994). Because I interpret the VAA to set forth a lower reporting standard than the majority does, I believe that the plaintiffs, two vulnerable adults, presented sufficient issues of fact regarding the suspected abuse to allow the case to proceed to the jury.

Subdivision 1 of the VAA clearly states the legislature's purpose in enacting the statute: "to protect adults who, because of physical or mental disability or dependency on institutional services, are particularly vulnerable to abuse or neglect." Minn.Stat. § 626.557, subd. 1. The legislature adds that the public policy of the state requires "the reporting of *suspected* abuse or neglect of vulnerable adults." *Id.* (emphasis added). The language from subdivision 1 mandating reporting of suspected abuse is repeated in subdivision 4, which describes the report that must be made:

> The written report shall be of sufficient content to identify the vulnerable adult, the caretaker, the nature and extent of the *suspected* abuse or neglect, any evidence of previous abuse or neglect, name and address of the reporter, and any other information that the reporter believes might be helpful in investigating the *suspected* abuse or neglect.

*Id.*, subd. 4 (emphases added).

The legislature's repeated use of the term "suspected" is a sufficient indication that the legislature indeed intended for abuse to be reported when it was merely suspected. The majority focuses almost exclusively on the language of subdivision 3, which states that a health care professional must make a report when she either knows about the abuse or "has *reasonable cause to believe* that a vulnerable adult is being or has been abused or neglected." *Id.*, subd. 3 (emphasis added). While I tend to agree with the majority that the reasonable cause to believe standard may involve a higher standard than suspicion, suspicion must remain a part of the equation.

Accordingly, the trial court should give an instruction on suspicion that is consistent with the VAA's stated policy of protecting adults who are vulnerable to abuse or neglect because of mental or physical disability. *Id.*, subd. 1. The legislature's purpose, served by requiring reports based on less information, arises from the perceived notion that vulnerable adults may not be in a position to fend for themselves when entrusted into the care of a health care professional who may be fully aware of the patients' vulnerability.

Evaluating the facts of this case in light of the legislative public policy requiring reporting of suspected abuse and construing them in the light most favorable to plaintiffs, I conclude that the plaintiffs submitted sufficient evidence to create a legally sufficient question of fact to go to the jury. *See Zinnel v. Berghuis Constr. Co.*, 274 N.W.2d 495, 498 (Minn.1979). House knew of Routt's significant boundary violations with another female patient, and she knew or should have known that he committed the serious boundary violation of drinking in front of the plaintiffs while treating them. A pattern of abuse and neglect should have been apparent to House, an experienced psychiatric nurse possessing special training and understanding of such problems. A report would have initiated an inquiry or investigation by appropriate authorities and may have brought necessary help to these two vulnerable adults as well as to Routt.

Routt's drinking in front of the plaintiffs while treating them, which the majority concludes House should have known about, was all the more serious given the fact that one of the plaintiffs was chemically dependent. Abuse includes "any repeated conduct which produces or could reasonably be expected to produce mental or emotional distress," and neglect includes failure to provide the vulnerable adult with necessary health care. Minn. Stat. § 626.557, subd. 2(d)(2), 2(e). Routt's drinking in front of these patients fits the statutory definition of abuse.

Subdivision 7 of the VAA imposes liability on a mandated reporter who negligently fails to make a required report. If the jury were to find that House should have had reasonable cause to believe that Routt abused the plaintiffs and was negligent in failing to report the abuse, it would then decide the amount of damages as well. *See id.*, subd. 7. I would therefore uphold the court of appeals' decision to overturn the directed verdict in favor of House and to remand the case for a new trial of the plaintiffs' claims against House under the VAA.